WHITMORE, INDIVIDUALLY AND AS NEXT FRIEND OF
SIMMONS *v.* ARKANSAS ET AL.

No. 88–7146.   Argued January 10, 1990—Decided April 24, 1990

REHNQUIST, C. J., delivered the opinion of the Court, in which WHITE, BLACKMUN, STEVENS, O'CONNOR, SCALIA, and KENNEDY, JJ., joined. MARSHALL, J., filed a dissenting opinion, in which BRENNAN, J., joined, *post*, p. 166.

*Arthur L. Allen,* by appointment of the Court, 493 U. S. 804, argued the cause and filed a brief for petitioner.

*J. Steven Clark,* Attorney General of Arkansas, argued the cause for respondents. With him on the brief for respondent State of Arkansas was *Clint Miller,* Assistant Attorney General. *John Harris* filed a brief for respondent Simmons.*

CHIEF JUSTICE REHNQUIST delivered the opinion of the Court.

This case presents the question whether a third party has standing to challenge the validity of a death sentence imposed on a capital defendant who has elected to forgo his right of appeal to the State Supreme Court. Petitioner Jonas Whitmore contends that the Eighth and Fourteenth Amendments prevent the State of Arkansas from carrying out the death sentence imposed on Ronald Gene Simmons without first conducting a mandatory appellate review of Simmons' conviction and sentence. We hold that petitioner lacks standing, and therefore dismiss the writ of certiorari.

I

On December 28, 1987, Ronald Gene Simmons shot and killed two people and wounded three others in the course of a rampage through the town of Russellville, Arkansas. After police apprehended Simmons, they searched his home in nearby Dover, Arkansas, and discovered the bodies of 14 members of Simmons' family, all of whom had been murdered. The State filed two sets of criminal charges against

---

*Gary B. Born, Daniel J. Popeo,* and *Paul D. Kamenar* filed a brief for the Washington Legal Foundation et al. as *amici curiae* urging affirmance.

*William Webster,* Attorney General of Missouri, *John M. Morris* and *Stephen D. Hawke,* Assistant Attorneys General, *Don Siegelman,* Attorney General of Alabama, *Jim Jones,* Attorney General of Idaho, *Hal Stratton,* Attorney General of New Mexico, *Anthony J. Celebrezze, Jr.,* Attorney General of Ohio, *T. Travis Medlock,* Attorney General of South Carolina, and *Mary Sue Terry,* Attorney General of Virginia, filed a brief for the State of Missouri et al. as *amici curiae.*

Simmons, one based on the two Russellville murders and the other covering the deaths of his family members.

Simmons was first tried for the Russellville crimes, and a jury convicted him of capital murder and sentenced him to death. After being sentenced, Simmons made this statement under oath: "'I, Ronald Gene Simmons, Sr., want it to be known that it is my wish and my desire that absolutely no action by anybody be taken to appeal or in any way change this sentence. It is further respectfully requested that this sentence be carried out expeditiously.'" See *Franz* v. *State*, 296 Ark. 181, 183, 754 S. W. 2d 839, 840 (1988). The trial court conducted a hearing concerning Simmons' competence to waive further proceedings, and concluded that his decision was knowing and intelligent.

As Simmons' execution date approached Louis J. Franz, a Catholic priest who counsels inmates at the Arkansas Department of Corrections, petitioned the Supreme Court of Arkansas for permission to proceed as Simmons' "next friend" and to prosecute an appeal on his behalf. The court held that Franz did not have standing as "next friend," because he had not alleged facts showing that he had ever met Simmons, much less that he had a close relationship with the defendant. It also rejected both his argument for standing under the Arkansas Constitution as an aggrieved taxpayer and his assertion that he should have standing as a concerned citizen to prevent an important legal issue from going unresolved at the appellate level.

In dicta, the court went on to state that Arkansas law does not require a mandatory appeal in all death penalty cases. It did note, however, that a defendant sentenced to death in Arkansas will be able to forgo his direct appeal "only if he has been judicially determined to have the capacity to understand the choice between life and death and to knowingly and intelligently waive any and all rights to appeal his sentence." *Id.*, at 189, 754 S. W. 2d, at 843. After reviewing the record of the trial court's competency hearing, the Supreme Court

held that Simmons had made a knowing and intelligent waiver of his right to appeal. Franz and another Arkansas death row inmate, Darrel Wayne Hill, then applied in Federal District Court for a writ of habeas corpus to prevent Simmons' execution, but the petition was denied on the ground that Franz and Hill did not have standing. *Franz* v. *Lockhart*, 700 F. Supp. 1005 (ED Ark. 1988), appeal pending, No. 89–1485EA (CA8).

The State subsequently tried Simmons for the murder of his 14 family members, and on February 10, 1989, a jury convicted him of capital murder and imposed a sentence of death by lethal injection. Simmons again notified the trial court of his desire to waive his right to direct appeal, and after a hearing, the court found Simmons competent to do so. The Supreme Court of Arkansas, pursuant to the rule established in *Franz*, reviewed the competency determination and affirmed the trial court's decision that Simmons had knowingly and intelligently waived his right to appeal. *Simmons* v. *State*, 298 Ark. 193, 766 S. W. 2d 422 (1989). The court commended the trial court and Simmons' counsel for doing "an exceptional job in examining and exploring [Simmons'] capacity to understand the choice between life and death and his ability to know and to intelligently waive any and all right he might have in an appeal of his sentence." *Id.*, at 194, 766 S. W. 2d, at 423. The court also noted that Simmons' counsel "thoroughly discussed seven possible points that could be argued for reversal on appeal" and that Simmons acknowledged those points but "rejected all encouragement and suggestions to appeal." *Ibid.*

Three days later, petitioner Jonas Whitmore, another death row inmate in Arkansas, sought permission from the Supreme Court of Arkansas to intervene in Simmons' proceeding both individually and "as next friend of Ronald Gene Simmons." The court concluded that Whitmore had failed to show he had standing to intervene, and it denied the motion. *Simmons* v. *State*, 298 Ark. 255, 766 S. W. 2d 423 (1989).

Whitmore then asked this Court to stay Simmons' execution, which was scheduled for March 16, 1989. We granted a stay pending the filing and disposition of a petition for certiorari, 489 U. S. 1073 (1989), and later granted Whitmore's petition for certiorari. 492 U. S. 917 (1989).

## II

### A

This is not the first time we have encountered a third party seeking to prevent the execution of a capital defendant who has decided to forgo further judicial proceedings. In *Gilmore* v. *Utah*, 429 U. S. 1012 (1976), we considered an application for a stay of the execution of Gary Mark Gilmore, filed by his mother Bessie Gilmore after the defendant declined to request relief. A majority of the Court concluded that Gilmore had made a knowing and intelligent waiver of any federal rights available to him and, accordingly, allowed the execution to go forward. Four Members of the Court, however, felt that the standing and other constitutional issues raised by the application were substantial and would have given the matter plenary consideration. Since *Gilmore*, we have been presented with other applications from third parties for stays of execution, see *Lenhard* v. *Wolff*, 443 U. S. 1306, stay of execution denied, 444 U. S. 807 (1979); *Evans* v. *Bennett*, 440 U. S. 1301, stay of execution denied, 440 U. S. 987 (1979), but until the present case, we have not requested full briefing and argument and issued an opinion of the Court on this recurring issue.

Petitioner Whitmore asks this Court to hold that despite Simmons' failure to appeal, the Eighth and Fourteenth Amendments require the State of Arkansas to conduct an appellate review of his conviction and sentence before it can proceed to execute him. It is well established, however, that before a federal court can consider the merits of a legal claim, the person seeking to invoke the jurisdiction of the court must establish the requisite standing to sue. Article III, of course,

gives the federal courts jurisdiction over only "cases and controversies," and the doctrine of standing serves to identify those disputes which are appropriately resolved through the judicial process. See *Valley Forge Christian College* v. *Americans United for Separation of Church & State, Inc.*, 454 U. S. 464, 471–476 (1982). Our threshold inquiry into standing "in no way depends on the merits of the [petitioner's] contention that particular conduct is illegal," *Warth* v. *Seldin*, 422 U. S. 490, 500 (1975), and we thus put aside for now Whitmore's Eighth Amendment challenge and consider whether he has established the existence of a "case or controversy."

Although we have acknowledged before that "the concept of 'Art. III standing' has not been defined with complete consistency in all of the various cases decided by this Court which have discussed it," *Valley Forge, supra,* at 475, certain basic principles have been distilled from our decisions. To establish an Art. III case or controversy, a litigant first must clearly demonstrate that he has suffered an "injury in fact." That injury, we have emphasized repeatedly, must be concrete in both a qualitative and temporal sense. The complainant must allege an injury to himself that is "distinct and palpable," *Warth, supra,* at 501, as opposed to merely "[a]bstract," *O'Shea* v. *Littleton,* 414 U. S. 488, 494 (1974), and the alleged harm must be actual or imminent, not "conjectural" or "hypothetical." *Los Angeles* v. *Lyons,* 461 U. S. 95, 101–102 (1983). Further, the litigant must satisfy the "causation" and "redressability" prongs of the Art. III minima by showing that the injury "fairly can be traced to the challenged action" and "is likely to be redressed by a favorable decision." *Simon* v. *Eastern Kentucky Welfare Rights Organization,* 426 U. S. 26, 38, 41 (1976); *Valley Forge, supra,* at 472. The litigant must clearly and specifically set forth facts sufficient to satisfy these Art. III standing requirements. A federal court is powerless to create its own

jurisdiction by embellishing otherwise deficient allegations of standing. See *Warth, supra,* at 508, 518.[1]

## B

As we understand Whitmore's claim of standing in his individual capacity, he alleges that the State has infringed rights that the Eighth Amendment grants to him personally and to the subject of the impending execution, Simmons. He therefore rests his claim to relief both on his own asserted legal right to a system of mandatory appellate review and on Simmons' similar right. Under either theory, Whitmore must establish Art. III standing, see *Secretary of State of Md.* v. *Joseph H. Munson Co.,* 467 U. S. 947, 956 (1984); *Singleton* v. *Wulff,* 428 U. S. 106, 112 (1976), and we find that his allegations fall short of doing so.

Whitmore's principal claim of injury in fact is that Arkansas has established a system of comparative review in death penalty cases, and that he has "a direct and substantial interest in having the data base against which his crime is compared to be complete and to not be arbitrarily skewed by the omission of any other capital case." Brief for Petitioner 21. Although he has already been convicted of murder and sentenced to death, has exhausted his direct appellate review, see *Whitmore* v. *State,* 296 Ark. 308, 756 S. W. 2d 890 (1988), and has been denied state postconviction relief, *Whitmore* v. *State,* 299 Ark. 55, 771 S. W. 2d 266 (1989), petitioner suggests that he might in the future obtain federal habeas corpus relief that would entitle him to a new trial. If, in that new trial, Whitmore is again convicted and sentenced to death, he would once more seek review of the sentence by the Supreme Court of Arkansas; that court would compare Whitmore's case with other capital cases to insure that the death penalty

---

[1] In addition to the constitutional requirements of Art. III, the court has developed several now-familiar prudential limitations on standing. See *Valley Forge Christian College* v. *Americans United for Separation of Church & State, Inc.,* 454 U. S. 464, 472–475 (1982). These limitations are not involved in this case.

is not freakishly or arbitrarily applied in Arkansas. Petitioner asserts that he would ultimately be injured by the State Supreme Court's failure to review Simmons' death sentence, because the heinous crimes committed by Simmons would not be included in the data base employed for Whitmore's comparative review. The injury would be redressed by an order from this Court that the Eighth Amendment requires mandatory appellate review.

Petitioner's alleged injury is too speculative to invoke the jurisdiction of an Art. III court. Whitmore's conviction and death sentence are final, and his claim that he may eventually secure federal habeas relief from his conviction is obviously problematic. Nor, although the odds may well be better, can petitioner prove that if he were to obtain habeas relief, he would be retried, convicted, and again sentenced to death. And even were we to follow Whitmore this far down the path, it is nothing more than conjecture that the addition of Simmons' crimes to a comparative review "data base" would lead the Supreme Court of Arkansas to set aside a death sentence for Whitmore, whose victim died after he stabbed her 10 times, cut her throat, and carved an "X" on the side of her face. 296 Ark., at 317, 756 S. W. 2d, at 895. In its comparative review of Whitmore's current sentence, the Arkansas court simply noted that defendants in similar robbery-murder capital crimes had also been sentenced to death. *Ibid.* Whitmore provides no factual basis for us to conclude that the sentence imposed on a mass murderer like Simmons would even be relevant to a future comparative review of Whitmore's sentence.

Whitmore's theory of injury is at least as speculative as others we have found insufficient to establish Art. III injury in fact. In *O'Shea* v. *Littleton, supra,* we held there was no case or controversy where residents of an Illinois town sought injunctive relief against a Magistrate and a Circuit Court Judge whom the plaintiffs claimed were engaged in a pattern and practice of illegal bondsetting, sentencing, and

jury-fee practices in criminal cases. The allegation of respondents (plaintiffs) in that case amounted to a claim "that *if* respondents proceed to violate an unchallenged law and *if* they are charged, held to answer, and tried in any proceedings before petitioners, they will be subjected to the discriminatory practices that petitioners are alleged to have followed." *Id.*, at 497. That contention, which we think is analogous to Whitmore's, took us "into the area of speculation and conjecture," *ibid.*, and beyond the bounds of our jurisdiction.

We have likewise thought inadequate allegations of future injury contingent on a plaintiff having an encounter with police wherein police would administer an allegedly illegal "chokehol[d]," *Los Angeles* v. *Lyons*, 461 U. S., at 105, on the prospective future candidacy of a former Congressman, *Golden* v. *Zwickler*, 394 U. S. 103, 109 (1969), and on police using deadly force against a person fleeing from an as yet uneffected arrest. *Ashcroft* v. *Mattis*, 431 U. S. 171, 172, n. 2 (1977). Recently in *Diamond* v. *Charles*, 476 U. S. 54 (1986), we rejected a physician's attempt to defend a state law restricting abortions, because his complaint that fewer abortions would lead to more paying patients was "'unadorned speculation'" insufficient to invoke the federal judicial power. *Id.*, at 66 (quoting *Simon* v. *Eastern Kentucky Welfare Rights Organization*, 426 U. S., at 44). Each of these cases demonstrates what we have said many times before and reiterate today: Allegations of possible future injury do not satisfy the requirements of Art. III. A threatened injury must be "'certainly impending'" to constitute injury in fact. *Babbitt* v. *Farm Workers*, 442 U. S. 289, 298 (1979) (quoting *Pennsylvania* v. *West Virginia*, 262 U. S. 553, 593 (1923)). See also *Lyons, supra*, at 102; *United States* v. *Richardson*, 418 U. S. 166, 177–178 (1974).

Probably the most attenuated injury conferring Art. III standing was that asserted by the respondents in *United States* v. *SCRAP*, 412 U. S. 669 (1973). There, an environ-

mental group challenged the Interstate Commerce Commission's approval of a surcharge on railroad freight rates, claiming that the adverse environmental impact of the ICC's action on the Washington metropolitan area would cause the group's members to suffer " 'economic, recreational and aesthetic harm.' " *Id.*, at 678. The SCRAP group alleged that "a general rate increase would . . . cause increased use of nonrecyclable commodities as compared to recyclable goods, thus resulting in the need to use more natural resources to produce such goods, some of which resources might be taken from the Washington area, and resulting in more refuse that might be discarded in national parks in the Washington area." *Id.*, at 688. The Court held that those pleadings alleged a specific and perceptible harm sufficient to survive a motion to dismiss for lack of standing, but also indicated that the United States could have been entitled to summary judgment on the standing issue if it showed that "the allegations were sham and raised no genuine issue of fact." *Id.*, at 689, and n. 15.

Even under the analysis of the standing question in *SCRAP*, which surely went to the very outer limit of the law, petitioner's asserted injury is not enough to establish jurisdiction. In *SCRAP*, the environmental group alleged that specific and perceptible harms—depletion of natural resources and increased littering—would befall its members imminently if the ICC orders were not reversed. That bald statement, even if incorrect, was held sufficient to withstand a motion to dismiss, because the plaintiffs in *SCRAP* may have been able to show at trial that the string of occurrences alleged would happen immediately. But Whitmore does not make—and could not responsibly make—a similar claim of immediate harm. We can take judicial notice of the fact that writs of habeas corpus are granted in only some cases, and that guilty verdicts are returned after only some trials. It is just not possible for a litigant to prove in advance that the judicial system will lead to any particular result in his

case. Thus, unlike the injury alleged in *SCRAP*, there is no amount of evidence that potentially could establish that Whitmore's asserted future injury is "'real and immediate.'" See *O'Shea*, 414 U. S., at 494. Moreover, as noted above, even if Whitmore could demonstrate with certainty that he would be retried, convicted, and sentenced, he has not shown that Simmons' convictions would be pertinent to his proportionality review in the Supreme Court of Arkansas.

Whitmore also contends that as a citizen of Arkansas, he is "entitled to the public interest protections of the Eighth Amendment," and has a right to invoke this Court's jurisdiction to insure that an execution is not carried out in Arkansas without appellate review. This allegation raises only the "generalized interest of all citizens in constitutional governance," *Schlesinger* v. *Reservists Committee to Stop the War*, 418 U. S. 208, 217 (1974), and is an inadequate basis on which to grant petitioner standing to proceed. To dispose of this claim, we need do no more than quote our decision in *Allen* v. *Wright*, 468 U. S. 737, 754 (1984): "This Court has repeatedly held that an asserted right to have the Government act in accordance with law is not sufficient, standing alone, to confer jurisdiction on a federal court." Accord, *Valley Forge College* v. *Americans United*, 454 U. S., at 482–483, and 489–490, n. 26 ("Were we to recognize standing premised on an 'injury' consisting solely of an alleged violation of a '"personal constitutional right" to a government that does not establish religion,' a principled consistency would dictate recognition of respondents' standing to challenge execution of every capital sentence on the basis of a personal right to a government that does not impose cruel and unusual punishment") (quoting *Americans United for Separation of Church & State, Inc.* v. *United States Dept. of Health, Education and Welfare*, 619 F. 2d 252, 265 (CA3 1980) (citation omitted)); *Schlesinger, supra*, at 216–227; *United States* v. *Richardson, supra*, at 176–177.

Perhaps recognizing the weakness of his claim for standing, petitioner argues next that the Court should create an exception to traditional standing doctrine for this case. The uniqueness of the death penalty and society's interest in its proper imposition, he maintains, justify a relaxed application of standing principles. The short answer to this suggestion is that the requirement of an Art. III "case or controversy" is not merely a traditional "rule of practice," but rather is imposed directly by the Constitution. It is not for this Court to employ untethered notions of what might be good public policy to expand our jurisdiction in an appealing case. We have previously resisted the temptation to "import profound differences of opinion over the meaning of the Eighth Amendment to the United States Constitution into the domain of administrative law," *Heckler* v. *Chaney*, 470 U. S. 821, 838 (1985); *id.*, at 839–840, n. 2 (BRENNAN, J., concurring), and restraint is even more important when the matter at issue is the constitutional source of the federal judicial power itself.[2] We hold that Whitmore does not have standing in his individual capacity to press an Eighth Amendment objection to Simmons' conviction and sentence.

## C

As an alternative basis for standing to maintain this action, petitioner purports to proceed as "next friend of Ronald Gene Simmons." Although we have never discussed the concept

---

[2] The cases relied upon by petitioner to establish that the strict requirement of standing, in some circumstances, is only a "rule of practice" that can be relaxed in view of countervailing policies are inapposite, because they concern *prudential* barriers to standing, not the mandates of Art. III. See *Eisenstadt* v. *Baird*, 405 U. S. 438, 445 (1972); *Dombrowski* v. *Pfister*, 380 U. S. 479, 486–487 (1965); *United States* v. *Raines*, 362 U. S. 17, 22 (1960). Because we conclude that petitioner has not established Art. III standing, we need not decide whether it would be appropriate in this type of action to relax the general prudential rule that a litigant "must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Warth* v. *Seldin*, 422 U. S. 490, 499 (1975).

of "next friend" standing at length, it has long been an accepted basis for jurisdiction in certain circumstances. Most frequently, "next friends" appear in court on behalf of detained prisoners who are unable, usually because of mental incompetence or inaccessibility, to seek relief themselves. *E. g., United States ex rel. Toth* v. *Quarles*, 350 U. S. 11, 13, n. 3 (1955) (prisoner's sister brought habeas corpus proceeding while he was being held in Korea). As early as the 17th century, the English Habeas Corpus Act of 1679 authorized complaints to be filed by "any one on . . . behalf" of detained persons, see 31 Car. II, ch. 2, and in 1704 the House of Lords resolved "[t]hat every Englishman, who is imprisoned by any authority whatsoever, has an undoubted right, by his agents, or friends, to apply for, and obtain a Writ of Habeas Corpus, in order to procure his liberty by due course of law." See *Ashby* v. *White*, 14 How. St. Tr. 695, 814 (Q. B. 1704). Some early decisions in this country interpreted ambiguous provisions of the federal habeas corpus statute to allow "next friend" standing in connection with petitions for writs of habeas corpus, see, *e. g., Collins* v. *Traeger*, 27 F. 2d 842, 843 (CA9 1928); *United States ex rel. Funaro* v. *Watchorn*, 164 F. 152, 153 (SDNY 1908),[3] and Congress eventually codified

---

[3] One section of the former habeas corpus statute provided that "[a]pplication for writ of habeas corpus shall be . . . *signed by the person for whose relief it is intended.*" Rev. Stat. § 754; 28 U. S. C. § 454 (1940 ed.) (emphasis added). Nevertheless, the *Collins* and *Watchorn* courts found an implicit authorization of "next friend" standing in § 760 of the revised statutes, which stated that "[t]he petitioner *or* the party imprisoned or restrained may deny any of the facts set forth in the return." Rev. Stat. § 760; 28 U. S. C. § 460 (1940 ed.) (emphasis added). At least one court concluded that "next friend" standing was not available under the old statute. *Ex parte Hibbs*, 26 F. 421, 435 (Ore. 1886). Other courts recognized the ability of third parties to apply for a writ but did not make clear the basis for their decisions. *United States ex rel. Bryant* v. *Houston*, 273 F. 915, 916–917 (CA2 1921); *Ex parte Dostal*, 243 F. 664, 668 (ND Ohio 1917). When Congress added the words "or by someone acting in his behalf" to § 754 in 1948, the revisers noted that the change "follow[ed] the actual practice of the courts." Revisers' Notes to 28 U. S. C. § 2242 (1982 ed.).

the doctrine explicitly in 1948. See 28 U. S. C. § 2242 (1982 ed.) ("Application for a writ of habeas corpus shall be in writing signed and verified by the person for whose relief it is intended *or by someone acting in his behalf*") (emphasis added).[4]

A "next friend" does not himself become a party to the habeas corpus action in which he participates, but simply pursues the cause on behalf of the detained person, who remains the real party in interest. *Morgan* v. *Potter*, 157 U. S. 195, 198 (1895); *Nash ex rel. Hashimoto* v. *MacArthur*, 87 U. S. App. D. C. 268, 269–270, 184 F. 2d 606, 607–608 (1950), cert. denied, 342 U. S. 838 (1951). Most important for present purposes, "next friend" standing is by no means granted automatically to whomever seeks to pursue an action on behalf of another. Decisions applying the habeas corpus statute have adhered to at least two firmly rooted prerequisites for "next friend" standing. First, a "next friend" must provide an adequate explanation—such as inaccessibility, mental incompetence, or other disability—why the real party in interest cannot appear on his own behalf to prosecute the action. *Wilson* v. *Lane*, 870 F. 2d 1250, 1253 (CA7 1989), cert. pending, No. 89–81; *Smith ex rel. Missouri Public Defender Comm'n* v. *Armontrout*, 812 F. 2d 1050, 1053 (CA8), cert. denied, 483 U. S. 1033 (1987); *Weber* v. *Garza*, 570 F. 2d 511, 513–514 (CA5 1978). Second, the "next friend" must be truly dedicated to the best interests of the person on whose behalf he seeks to litigate, see, *e. g.*, *Morris* v. *United States*, 399 F. Supp. 720, 722 (ED Va. 1975), and it has been further

---

[4] Some courts have permitted "next friends" to prosecute actions outside the habeas corpus context on behalf of infants, other minors, and adult mental incompetents. See, *e. g*, *Garnett* v. *Garnett*, 114 Mass. 379 (1874) ("next friend" may bring action for divorce on behalf of an insane person); *Campbell* v. *Campbell*, 242 Ala. 141, 5 So. 2d 401 (1941) (same); *Blumenthal* v. *Craig*, 81 F. 320, 321–322 (CA3 1897) ("next friend" was admitted by court to prosecute personal injury action on behalf of the plaintiff, who was a minor); *Baltimore & Ohio R. Co.* v. *Fitzpatrick*, 36 Md. 619 (1872) (same).

suggested that a "next friend" must have some significant relationship with the real party in interest.  *Davis* v. *Austin*, 492 F. Supp. 273, 275–276 (ND Ga. 1980) (minister and first cousin of prisoner denied "next friend" standing).  The burden is on the "next friend" clearly to establish the propriety of his status and thereby justify the jurisdiction of the court.  *Smith, supra*, at 1053; *Groseclose ex rel. Harries* v. *Dutton*, 594 F. Supp. 949, 952 (MD Tenn. 1984).

These limitations on the "next friend" doctrine are driven by the recognition that "[i]t was not intended that the writ of habeas corpus should be availed of, as matter of course, by intruders or uninvited meddlers, styling themselves next friends."  *United States ex rel. Bryant* v. *Houston*, 273 F. 915, 916 (CA2 1921); see also *Rosenberg* v. *United States*, 346 U. S. 273, 291–292 (1953) (Jackson, J., concurring with five other Justices) (discountenancing practice of granting "next friend" standing to one who was a stranger to the detained persons and their case and whose intervention was unauthorized by the prisoners' counsel).  Indeed, if there were no restriction on "next friend" standing in federal courts, the litigant asserting only a generalized interest in constitutional governance could circumvent the jurisdictional limits of Art. III simply by assuming the mantle of "next friend."

Whitmore, of course, does not seek a writ of habeas corpus on behalf of Simmons.  He desires to intervene in a state-court proceeding to appeal Simmons' conviction and death sentence.  Under these circumstances, there is no federal statute authorizing the participation of "next friends."  The Supreme Court of Arkansas recognizes, apparently as a matter of common law, the availability of "next friend" standing in the Arkansas courts, see *Franz* v. *State*, 296 Ark., at 184, 754 S. W. 2d, at 840–841, but declined to grant it to Whitmore.  Without deciding whether a "next friend" may ever invoke the jurisdiction of a federal court absent congressional authorization, we think the scope of any federal doctrine of "next friend" standing is no broader than what is

permitted by the habeas corpus statute, which codified the historical practice. And in keeping with the ancient tradition of the doctrine, we conclude that one necessary condition for "next friend" standing in federal court is a showing by the proposed "next friend" that the real party in interest is unable to litigate his own cause due to mental incapacity, lack of access to court, or other similar disability.

That prerequisite for "next friend" standing is not satisfied where an evidentiary hearing shows that the defendant has given a knowing, intelligent, and voluntary waiver of his right to proceed, and his access to court is otherwise unimpeded. See *Gilmore* v. *Utah*, 429 U. S., at 1017 (STEVENS, J., concurring). Although we are not here faced with the question whether a hearing on mental competency is required by the United States Constitution whenever a capital defendant desires to terminate further proceedings, such a hearing will obviously bear on whether the defendant is able to proceed on his own behalf. The Supreme Court of Arkansas requires a competency hearing as a matter of state law, and in this case it affirmed the trial court's finding that Simmons had "the capacity to understand the choice between life and death and to knowingly and intelligently waive any and all rights to appeal his sentence." *Simmons* v. *State*, 298 Ark., at 194, 766 S. W. 2d, at 423. At oral argument, Whitmore's counsel questioned the validity of the waiver, but we find no reason to disturb the judgment of the Supreme Court of Arkansas on this point.

Simmons was questioned by counsel and the trial court concerning his choice to accept the death sentence, and his answers demonstrate that he appreciated the consequences of that decision. He indicated that he understood several possible grounds for appeal, which had been explained to him by counsel, but informed the court that he was "not seeking any technicalities." Tr. 15. In a psychiatric interview, Simmons stated that he would consider it "'a terrible miscarriage of justice for a person to kill people and not be exe-

cuted,'" *id.*, at 29, and there was no meaningful evidence that he was suffering from a mental disease, disorder, or defect that substantially affected his capacity to make an intelligent decision. See *Rees* v. *Peyton,* 384 U. S. 312, 314 (1966). We therefore hold that Whitmore, having failed to establish that Simmons is unable to proceed on his own behalf, does not have standing to proceed as "next friend" of Ronald Gene Simmons.

\*    \*    \*

At the beginning of this century, the Court confronted a situation similar to this in which a concerned citizen sought to bring an ordinary civil action to secure relief for a condemned man. The Court's response on that occasion is equally apt today: "However friendly he may be to the doomed man and sympathetic for his situation; however concerned he may be lest unconstitutional laws be enforced, and however laudable such sentiments are, the grievance they suffer and feel is not special enough to furnish a cause of action in a case like this." *Gusman* v. *Marrero,* 180 U. S. 81, 87 (1901).

Jonas Whitmore lacks standing to proceed in this Court, and the writ of certiorari is dismissed for want of jurisdiction. See *Doremus* v. *Board of Education of Hawthorne,* 342 U. S. 429 (1952).

*It is so ordered.*

JUSTICE MARSHALL, with whom JUSTICE BRENNAN joins, dissenting.

The Court today allows a State to execute a man even though no appellate court has reviewed the validity of his conviction or sentence. In reaching this result, the Court does not address the constitutional claim presented by petitioner: whether a State must provide appellate review in a capital case despite the defendant's desire to waive such review. Rather, it decides that petitioner does not have standing to raise that issue before this Court. The Court rejects petitioner's argument that he should be allowed to pro-

ceed as Ronald Gene Simmons' "next friend," relying on the federal common-law doctrine that a competent defendant's waiver of his right to appeal precludes another person from appealing on his behalf. If petitioner's constitutional claim is meritorious, however, Simmons' execution violates the Eighth Amendment. The Court would thus permit an unconstitutional execution on the basis of a common-law doctrine that the Court has the power to amend.

Given the extraordinary circumstances of this case, then, consideration of whether federal common law precludes Jonas Whitmore's standing as Ronald Simmons' next friend should be informed by a consideration of the merits of Whitmore's claim. For the reasons discussed herein, the Constitution requires that States provide appellate review of capital cases notwithstanding a defendant's desire to waive such review. To prevent Simmons' unconstitutional execution, the Court should relax the common-law restriction on next-friend standing and permit Whitmore to present the merits question on Simmons' behalf. By refusing to address that question, the Court needlessly abdicates its grave responsibility to ensure that no person is wrongly executed. I dissent.

I

This Court has held that the Constitution does not require States to provide appellate review of noncapital criminal cases. *Ross* v. *Moffitt*, 417 U. S. 600, 611 (1974) (citing *McKane* v. *Durston*, 153 U. S. 684, 687 (1894)). It is by now axiomatic, however, that the unique, irrevocable nature of the death penalty necessitates safeguards not required for other punishments.

> "Under the Eighth Amendment, the death penalty has been treated differently from all other punishments. Among the most important and consistent themes in this Court's death penalty jurisprudence is the need for special care and deliberation in decisions that may lead to the imposition of that sanction. The Court has accord-

ingly imposed a series of unique substantive and procedural restrictions designed to ensure that capital punishment is not imposed without the serious and calm reflection that ought to precede any decision of such gravity and finality." *Thompson* v. *Oklahoma*, 487 U. S. 815, 856 (1988) (O'CONNOR, J., concurring in judgment) (citation omitted).

See also *Zant* v. *Stephens*, 462 U. S. 862, 884 (1983) ("[B]ecause there is a qualitative difference between death and any other permissible form of punishment, 'there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case'") (quoting *Woodson* v. *North Carolina*, 428 U. S. 280, 305 (1976) (plurality opinion)); *Eddings* v. *Oklahoma*, 455 U. S. 104, 118 (1982) (O'CONNOR, J., concurring) ("[T]his Court has gone to extraordinary measures to ensure that the prisoner sentenced to be executed is afforded process that will guarantee, as much as is humanly possible, that the sentence was not imposed out of whim, passion, prejudice, or mistake").

This Court has consistently recognized the crucial role of appellate review in ensuring that the death penalty is not imposed arbitrarily or capriciously. In *Gregg* v. *Georgia*, 428 U. S. 153 (1976), the Court upheld Georgia's capital sentencing scheme in large part because the statute required appellate review of every death sentence.

> "As an important additional safeguard against arbitrariness and caprice, the Georgia statutory scheme provides for automatic appeal of all death sentences to the State's Supreme Court. That court is required by statute to review each sentence of death and determine whether it was imposed under the influence of passion or prejudice, whether the evidence supports the jury's finding of a statutory aggravating circumstance, and whether the sentence is disproportionate compared to those sentences imposed in similar cases." *Id.*, at 198 (joint opinion of Stewart, Powell, and STEVENS, JJ.).

See also *id.*, at 211 (WHITE, J., joined by Burger, C. J., and REHNQUIST, J., concurring in judgment) ("An important aspect of the new Georgia legislative scheme . . . is its provision for appellate review . . . in every case in which the death penalty is imposed"). The provision of automatic appellate review was also a significant factor in the Court's decisions that same Term upholding the capital sentencing schemes of Florida and Texas. See *Proffitt* v. *Florida*, 428 U. S. 242, 253 (1976) (joint opinion of Stewart, Powell, and STEVENS, JJ.) (risk of arbitrary or capricious infliction of death penalty "is minimized by Florida's appellate review system, under which the evidence of the aggravating and mitigating circumstances is reviewed and reweighed by the Supreme Court of Florida 'to determine independently whether the imposition of the ultimate penalty is warranted'") (citation omitted); *Jurek* v. *Texas*, 428 U. S. 262, 276 (1976) (joint opinion of Stewart, Powell, and STEVENS, JJ.) ("By providing prompt judicial review of the jury's decision in a court with statewide jurisdiction, Texas has provided a means to promote the evenhanded, rational, and consistent imposition of death sentences under law"). More recently, in *Zant* v. *Stephens*, *supra*, the Court stressed that its decision to uphold the Georgia death penalty statute "depend[ed] in part on the existence of an important procedural safeguard, the mandatory appellate review of each death sentence by the Georgia Supreme Court to avoid arbitrariness and to assure proportionality." 462 U. S., at 890. Accord, *McCleskey* v. *Kemp*, 481 U. S. 279, 303 (1987). See also *Clemons* v. *Mississippi*, 494 U. S. 738, 749 (1990) ("[T]his Court has repeatedly emphasized that meaningful appellate review of death sentences promotes reliability and consistency").

The existence of mandatory appellate review was also a significant factor in the Court's decision upholding California's capital sentencing scheme in *Pulley* v. *Harris*, 465 U. S. 37, 53 (1984). Moreover, although the Court held that the Constitution does not require appellate courts to engage in

proportionality review, it nevertheless acknowledged that *Gregg* "suggested that some form of meaningful appellate review is required." *Id.*, at 45 (citing *Gregg, supra,* at 153, 198, 204–206 (joint opinion of Stewart, Powell, and STEVENS, JJ.)). See also *Pulley,* 465 U. S., at 49 ("*Gregg* and *Proffitt* were focused not on proportionality review as such, but only on the provision of some sort of prompt and automatic appellate review"); *id.,* at 54 (STEVENS, J., concurring in part and concurring in judgment) (stating that this Court's precedents establish that "some form of meaningful appellate review is constitutionally required").

Thus, much of this Court's death penalty jurisprudence rests on the recognition that appellate review is a crucial means of promoting reliability and consistency in capital sentencing. The high percentage of capital cases reversed on appeal vividly demonstrates that appellate review is an indispensable safeguard. Since 1983, the Arkansas Supreme Court, on direct review, has reversed in 8 out of 19 cases in which the death penalty had been imposed. See *Robertson* v. *State,* 298 Ark. 131, 137, 765 S. W. 2d 936, 940 (1989) (Hickman, J., concurring); *Fretwell* v. *State,* 289 Ark. 91, 99, 708 S. W. 2d 630, 634–635 (1986) (Hickman, J., concurring). Other States also have remarkably high reversal rates in capital cases. See, *e. g.,* Burt, Disorder in the Court: The Death Penalty and the Constitution, 85 Mich. L. Rev. 1741, 1792 (1987) (Florida Supreme Court set aside 47% of death sentences between 1972 and 1984); Dix, Appellate Review of the Decision to Impose Death, 68 Geo. L. J. 97, 144–145, and n. 437 (1979) (Texas Court of Criminal Appeals reversed conviction or invalidated death sentence in 33% of cases between October 1975 and March 1979); *id.,* at 111, and n. 92 (Georgia Supreme Court did same in 30% of capital cases between April 1974 and March 1979). Cf. *Barefoot* v. *Estelle,* 463 U. S. 880, 915 (1983) (MARSHALL, J., dissenting) (between 1976 and 1983, approximately 70% of capital defendants who had been denied federal habeas relief in district courts pre-

vailed in courts of appeals); Greenberg, Capital Punishment as a System, 91 Yale L. J. 908, 918 (1982) (estimating that 60% of convictions or sentences imposed under capital punishment statutes enacted after *Furman* v. *Georgia*, 408 U. S. 238 (1972), were reversed at some point in postconviction appeals process; in contrast, federal criminal judgments in noncapital cases had a reversal rate of 6.5%); U. S. Dept. of Justice, Bureau of Justice Statistics, Bulletin, Capital Punishment 1988, p. 1 (July 1989) (116 of 296 death row inmates sent to prison in 1988 had sentences vacated or commuted during that year). These statistics make clear that in the absence of some form of appellate review, an unacceptably high percentage of criminal defendants would be wrongfully executed—"wrongfully" because they were innocent of the crime, undeserving of the severest punishment relative to similarly situated offenders, or denied essential procedural protections by the State. See Greenberg, *supra*, at 919–922 (listing numerous examples of death row inmates subsequently found to be not guilty and instances of capital convictions and sentences reversed for violations of federal or state law).

Our cases and state courts' experience with capital cases compel the conclusion that the Eighth and Fourteenth Amendments require appellate review of at least death sentences to prevent unjust executions. I believe the Constitution also mandates review of the underlying convictions. The core concern of all our death penalty decisions is that States take steps to ensure to the greatest extent possible that no person is wrongfully executed. A person is just as wrongfully executed when he is innocent of the crime or was improperly convicted as when he was erroneously sentenced to death. States therefore must provide review of both the convictions and sentences in death cases.

## II

Appellate review is necessary not only to safeguard a defendant's right not to suffer cruel and unusual punishment

but also to protect society's fundamental interest in ensuring that the coercive power of the State is not employed in a manner that shocks the community's conscience or undermines the integrity of our criminal justice system. See *Gilmore* v. *Utah*, 429 U. S. 1012, 1019 (1976) (MARSHALL, J., dissenting). Because a wrongful execution is an affront to society as a whole, a person may not consent to being executed without appellate review. See *id.*, at 1018 (WHITE, J., dissenting) ("[T]he consent of a convicted defendant in a criminal case does not privilege a State to impose a punishment otherwise forbidden by the Eighth Amendment"). As the District Court stated so compellingly on review of the habeas petition filed on Simmons' behalf by Reverend Louis Franz and Darrel Wayne Hill: "What is at stake here is our collective right as a civilized people not to have cruel and unusual punishment inflicted in our name. It is because of the crying need to vindicate that right, that basic value, that Simmons should be held unable 'to waive resolution in state courts' of the correctness of his death sentence." *Franz* v. *Lockhart*, 700 F. Supp. 1005, 1024 (ED Ark. 1988) (quoting *Gilmore* v. *Utah, supra,* at 1018 (WHITE, J., dissenting)) (citation omitted), appeal pending, No. 89–1485EA (CA8). See also, *e. g., Commonwealth* v. *McKenna,* 476 Pa. 428, 441, 383 A. 2d 174, 181 (1978) ("The doctrine of waiver . . . was not . . . designed to block giving effect to a strong public interest, which itself is a jurisprudential concern[, or to] allo[w] a criminal defendant to choose his own sentence. . . . The waiver rule cannot be exalted to a position so lofty as to require this Court to blind itself to the real issue—the propriety of allowing the state to conduct an illegal execution of a citizen") (footnote omitted); *People* v. *Stanworth,* 71 Cal. 2d 820, 834, 457 P. 2d 889, 899 (1969) ("[W]e are not dealing with a right or privilege conferred by law upon the litigant for his sole personal benefit. We are concerned with a principle of fundamental public policy. The law cannot suffer the state's interest and concern in the observance and enforcement of

this policy to be thwarted through the guise of waiver of a personal right by an individual") (internal quotation marks omitted; citation omitted).

A defendant's voluntary submission to a barbaric punishment does not ameliorate the harm that imposing such a punishment causes to our basic societal values and to the integrity of our system of justice. Certainly a defendant's consent to being drawn and quartered or burned at the stake would not license the State to exact such punishments. Nor could the State knowingly execute an innocent man merely because he refused to present a defense at trial and waived his right to appeal. Similarly, the State may not conduct an execution rendered unconstitutional by the lack of an appeal merely because the defendant agrees to that punishment.

This case thus does not involve a capital defendant's so-called "right to die." When a capital defendant seeks to circumvent procedures necessary to ensure the propriety of his conviction and sentence, he does not ask the State to permit him to take his own life. Rather, he invites the State to violate two of the most basic norms of a civilized society—that the State's penal authority be invoked only where necessary to serve the ends of justice, not the ends of a particular individual, and that punishment be imposed only where the State has adequate assurance that the punishment is justified. The Constitution forbids the State to accept that invitation.

Society's overwhelming interest in preventing wrongful executions is evidenced by the fact that almost all of the 37 States with the death penalty apparently have prescribed mandatory, nonwaivable appellate review of at least the sentence in capital cases. U. S. Dept. of Justice, Bureau of Justice Statistics, Bulletin, Capital Punishment 1988, p. 5 (July 1989); Carter, Maintaining Systemic Integrity in Capital Cases: The Use of Court-Appointed Counsel to Present Mitigating Evidence When the Defendant Advocates Death, 55

Tenn. L. Rev. 95, 113–114 (1987).[1]  The Arkansas Supreme
Court is the only state high court that has held that a compe-
tent capital defendant's waiver of his appeal precludes appel-
late review entirely.  *Franz* v. *State*, 296 Ark. 181, 196–197,
754 S. W. 2d 839, 847 (1988) (Glaze, J., concurring and dis-
senting).   Furthermore, since the reinstitution of capital

---

[1] Thirteen States, by statute, rule, or case law, explicitly provide that
review of at least the capital sentence will occur with or without the de-
fendant's election or participation.   Ala. Code § 12–22–150 (1986); Cal.
Penal Code Ann. § 1239(b) (West Supp. 1990); *People* v. *Stanworth*, 71 Cal.
2d 820, 832–834, 457 P. 2d 889, 898–899 (1969); Del. Code Ann., Tit. 11,
§ 4209(g) (1987); *Goode* v. *State*, 365 So. 2d 381, 384 (Fla. 1978) (construing
Fla. Stat. § 921.141(4) (1989)); Ill. Rev. Stat., ch. 110A, ¶ 606(a) (1987);
*Judy* v. *State*, 275 Ind. 145, 157–158, 416 N. E. 2d 95, 102 (1981) (constru-
ing Ind. Code § 35–50–2–9 (1988)); Mo. Rev. Stat. § 565.035 (1986); Nev.
Rev. Stat. § 177.055(2) (1989); *Cole* v. *State*, 101 Nev. 585, 590, 707 P. 2d
545, 548 (1985); N. J. Stat. Ann. § 2C:11–3(e) (West Supp. 1989); *Common-
wealth* v. *McKenna*, 476 Pa. 428, 439–440, 383 A. 2d 174, 181 (1978) (con-
struing predecessor statute to 42 Pa. Cons. Stat. § 9711(h) (1988)); Tenn.
Code Ann. § 39–2–205 (1982); *State* v. *Holland*, 777 P. 2d 1019, 1022 (Utah
1989) (construing Utah Code Ann. § 77–35–26(10) (Supp. 1989)); see also
Utah Code Ann. § 76–3–206(2) (1978); Vt. Rule App. Proc. 3(b).   Twenty-
two States' statutes or rules employ language indicating that their appel-
late courts must review at least the sentence in every capital case.   Ariz.
Rule Crim. Proc. 31.2(b); Colo. Rev. Stat. § 16–11–103(7)(a) (Supp. 1989);
Conn. Gen. Stat. § 53a–46b (1985); Ga. Code Ann. § 17–10–35 (1982); Idaho
Code § 19–2827 (1987); Ky. Rev. Stat. Ann. § 532.075 (Michie 1985); La.
Code Crim. Proc. Ann., Art. 905.9 (West 1984); Md. Ann. Code, Art. 27,
§ 414 (1987); Miss. Code Ann. § 99–19–105 (Supp. 1989); Mont. Code Ann.
§ 46–18–307 (1989); Neb. Rev. Stat. § 29–2525 (1989); N. H. Rev. Stat.
Ann. § 630.5(vi) (1986); N. M. Stat. Ann. § 31–20A–4 (1987); N. C. Gen.
Stat. § 15A.2000(d)(1) (1988); Okla. Stat., Tit. 21, § 701.13 (Supp. 1989);
Ore. Rev. Stat. § 163.150(1)(g) (1989); S. C. Code § 16–3–25 (1985); S. D.
Codified Laws § 23A–27A–9 (1988); Tex. Crim. Proc. Code Ann. § 37.071(h)
(Supp. 1990); Va. Code § 17–110.1 (1988); Wash. Rev. Code § 10.95.100
(1989); Wyo. Stat. § 6–2–103 (1988).   Ohio's rule as to waiver is unclear.
See Ohio Rev. Code Ann. § 2929.05 (1987).   In *State* v. *Brooks*, 25 Ohio St.
3d 144, 495 N. E. 2d 407 (1986), however, both the Ohio Court of Appeals
and Ohio Supreme Court reviewed the defendant's death sentence after
the State Court of Appeals denied his motion to withdraw his appeal.

punishment in 1976, only one person, Gary Gilmore, has been executed without any appellate review of his case. See *Gilmore* v. *Utah*, 429 U. S. 1012 (1976). Following Utah's execution of Gilmore, that State amended its law to provide for mandatory, nonwaivable appellate review. Utah Code Ann. § 77–35–26(10) (Supp. 1989); see also Utah Code Ann. § 76–3–206(2) (1978). The extreme rarity of unreviewed executions in itself suggests the unconstitutionality of such killings. Cf. *Enmund* v. *Florida*, 458 U. S. 782, 788–796 (1982) (finding unconstitutional Florida's death penalty for felony murder in part because only 8 of 36 jurisdictions authorized death for such a crime); *Coker* v. *Georgia*, 433 U. S. 584, 593–597 (1977) (striking down Georgia's provision for death penalty for rape of adult woman in part because Georgia was only State with such a provision).

This Court has recognized in other contexts that societal interests may justify limiting a competent person's ability to waive a constitutional protection. In *Singer* v. *United States*, 380 U. S. 24 (1965), for example, the Court upheld the constitutionality of Federal Rule of Criminal Procedure 23(a), which conditions a defendant's waiver of his right to a jury trial on the approval of the court and the prosecution. The Court reasoned that "[t]he Constitution recognizes an adversary system as the proper method of determining guilt, and the Government, as a litigant, has a legitimate interest in seeing that cases in which it believes a conviction is warranted are tried before the tribunal which the Constitution regards as most likely to produce a fair result." 380 U. S., at 36. Society's interest, expressed in the Eighth Amendment, of ensuring that punishments are neither cruel nor unusual similarly justifies restricting a defendant's ability to acquiesce in the infliction of wrongful punishment. Although death may, to some death row inmates, seem preferable to life in prison, society has the right, and indeed the obligation,

to see that procedural safeguards are observed before the State takes a human life.[2]

## III

Given that the Constitution requires mandatory, non-waivable appellate review, the question remains whether Whitmore may seek relief in this Court on Simmons' behalf. This Court should take whatever measures are necessary, and within its power, to prevent Simmons' illegal execution. The common-law doctrine of next-friend standing provides a mechanism for doing so without exceeding the Article III limitations on our jurisdiction.[3] The Court's refusal to use that mechanism suggests that the Court's desire to eliminate delays in executions exceeds its solicitude for the Eighth Amendment.

As the Court acknowledges, a next friend pursues an action on behalf of the real party in interest. *Ante*, at 163. Simmons obviously satisfies the Article III and prudential standing requirements. The Court therefore does not dispute that Whitmore, standing in for Simmons, would also meet these requirements. The Court refuses to allow Whitmore to act as Simmons' next friend, however, because he has not shown that Simmons "is unable to litigate his own cause due to mental incapacity, lack of access to court, or

---

[2] Underlying the Court's decision may be the assumption that a competent defendant would never waive his right to appeal unless he was guilty of the crime and deserved to die. See *Franz* v. *Lockhart*, 700 F. Supp. 1005, 1023 (ED Ark. 1988), appeal pending, No. 89–1485EA (CA8). There is no reason to believe, however, that only defendants guilty of the most heinous crimes would choose death over life in prison.

[3] The question whether Whitmore may act as Simmons' next friend in this Court is distinct from the question whether Whitmore could do so in the Arkansas Supreme Court. This Court cannot impose federal standing restrictions, whether derived from Article III or federal common law, on state courts. See *ASARCO Inc.* v. *Kadish*, 490 U. S. 605, 620 (1989); *Department of Labor* v. *Triplett*, 494 U. S. 715, 729 (1990) (MARSHALL, J., concurring in judgment). The Court's holding thus affects only federal courts.

other similar disability." *Ante*, at 165. The Court suggests, without holding, that a party asserting next-friend status must also prove that he is "truly dedicated to the best interests of the person on whose behalf he seeks to litigate," *ante*, at 163, and perhaps, too, that he has "some significant relationship with the real party in interest," *ante*, at 164.[4]

Assuming for the sake of argument that Simmons was competent to forgo petitioning this Court for review[5] and that Whitmore is only minimally interested in Simmons' welfare, I would nevertheless permit Whitmore to proceed as Simmons' next friend. The requirements for next-friend standing are creations of common law, not of the Constitution. *Ante*, at 164–165. Thus, no constitutional considerations impede the Court's deciding this case on the merits.[6] The Court cer-

---

[4] Despite the Court's suggestion, I cannot believe that this Court would ever hold that a defendant judged incompetent to waive his right to appeal could be executed without appellate review on the ground that no one with a sufficiently close relation to him had stepped forward to pursue the appeal. Rather, a court would be required to appoint someone to represent such a defendant. See *Franz* v. *Lockhart, supra,* at 1011, n. 2. See also Carter, Maintaining Systemic Integrity in Capital Cases: The Use of Court-Appointed Counsel to Present Mitigating Evidence When the Defendant Advocates Death, 55 Tenn. L. Rev. 95 (1987).

[5] In determining Simmons' competency to waive his right to seek relief in this Court, the majority relies on the Arkansas trial court's finding that Simmons was competent to waive his right to appeal in *state* court. *Ante*, at 165–166. At no point, however, has any court determined that Simmons was competent to waive his right to petition this Court for a writ of certiorari. Legal competency is not static. Given that Simmons' life turns on this question, the Court should at least require a specific determination that he was competent to forgo petitioning this Court before it dismisses this case without reaching the merits.

[6] The Court suggests that some restriction on next-friend standing is necessary to prevent a litigant who asserts only a generalized grievance from circumventing Article III's standing requirements. *Ante*, at 164. But as long as the real party in interest satisfies those standing requirements, as Simmons clearly does, this Court will be presented with an actual case or controversy. If the Court's suggestion were true, it would necessitate abolishing next-friend standing entirely. In terms of Article

tainly has the authority to expand or contract a common-law doctrine where necessary to serve an important judicial or societal interest. Examples of the Court's exercise of that authority pervade our case law. See, *e. g.*, *Harlow* v. *Fitzgerald*, 457 U. S. 800, 815–819 (1982) (abandoning subjective element of qualified immunity defense to avoid excessive disruption of government and to permit the resolution of insubstantial claims on summary judgment); *Anderson* v. *Creighton*, 483 U. S. 635, 645 (1987) (stating that *Harlow* "completely reformulated qualified immunity along principles not at all embodied in the common law, replacing the inquiry into subjective malice so frequently required at common law with an objective inquiry into the legal reasonableness of the official action"); *Parklane Hosiery Co.* v. *Shore*, 439 U. S. 322, 326–333 (1979) (discarding common-law doctrine of mutuality of parties and authorizing offensive use of collateral estoppel to protect litigants from burden of relitigating issues and to promote judicial economy). See also *Livingston* v. *Jefferson*, 15 F. Cas. 660, 663 (No. 8,411) (CC Va. 1811) (Marshall, C. J., Circuit Judge) (common-law principle is "a principle of unwritten law, which is really human reason applied by courts, not capriciously, but in a regular train of decisions, to human affairs, according to the circumstances of the nation, the necessity of the times, and the general state of things, [and is] susceptible of modification"). In this case, the magnitude of the societal interests at stake justifies relaxing the next-friend requirements to permit Whitmore to challenge Simmons' execution.

Relaxation of those requirements is especially warranted here because judicial consideration of the claim that the Constitution requires appellate review of every capital case would

---

III, a next friend who represents the interests of an incompetent person with whom he has a significant relation is no different from a next friend who pursues a claim on behalf of a competent stranger; both rely wholly on the injury to the real party in interest to satisfy constitutional standing requirements.

otherwise be virtually impossible. If a capital defendant desires appellate review, he will undoubtedly obtain that review in state court, see n. 1, *supra*, and, perhaps, in federal court on a petition for habeas corpus. If he waives his right to appeal and is found incompetent, a next friend will be allowed to pursue the appeal, again obviating the need to decide whether the Eighth Amendment requires mandatory, nonwaivable review. Although the fact that a constitutional issue will never be resolved may not justify carving out an exception to Article III's standing requirements, surely that fact, when considered with society's commitment to avoiding wrongful executions, provides ample cause for enlarging the scope of a federal common-law doctrine.

The only purpose the Court invokes for rigidly applying the restrictions on next-friend standing is preventing "'intruders or uninvited meddlers'" from pursuing habeas corpus relief "'as matter of course.'" *Ante*, at 164 (quoting *United States ex rel. Bryant* v. *Houston*, 273 F. 915, 916 (CA2 1921)). This purpose, however, does not justify refusing to allow Whitmore to proceed as Simmons' next friend in this Court.[7] First, the Court need not hold that all federal

---

[7] Appeal to *stare decisis* similarly cannot relieve the Court of responsibility for today's disturbing decision. This case is the first opportunity for this Court to address the next-friend issue raised here with the benefit of full briefing by the parties. Four times the Court was presented with this question in the context of applications for stays of executions filed by parties other than the defendants. Three times the Court denied the applications. See *Gilmore* v. *Utah*, 429 U. S. 1012 (1976); *Evans* v. *Bennett*, 440 U. S. 987 (1979); *Lenhard* v. *Wolff*, 444 U. S. 807 (1979). In *Gilmore*, the Court stated only that the competent defendant had knowingly and intelligently waived any federal rights. 429 U. S., at 1013. In *Evans*, then-JUSTICE REHNQUIST, in his capacity as Circuit Justice, stayed the execution pending consideration by the full Court. 440 U. S. 1301 (1979) (in chambers). The Court then denied the application without opinion, 440 U. S. 987 (1979), with JUSTICE BRENNAN noting in his concurrence that a stay was not necessary because the State had not set an execution date, *ibid.* In *Lenhard*, the Court did not issue an opinion. 444 U. S., at 807. In *Rosenberg* v. *United States*, 346 U. S. 273 (1953), how-

courts must relax restrictions on next-friend standing; the common-law rules could be altered only to the extent this Court deems necessary. If this Court were to hold that Whitmore has standing before it, and then, on the merits, that the Constitution requires some form of nonwaivable appellate review in state court, at least one level of review would be assured for each capital case. Such a decision would obviate the need for relaxing the restrictions in federal district courts and courts of appeals.[8]

---

ever, the Court did consider the merits of an application to stay the executions of Julius and Ethel Rosenberg filed by counsel for a man who had no connection to the Rosenbergs and who had not participated in any proceedings related to their case until the stay proceedings in this Court. *Id.*, at 288–289 *(per curiam); id.*, at 291 (Jackson, J., concurring) ("Edelman [the applicant] is a stranger to the Rosenbergs and to their case. His intervention was unauthorized by them and originally opposed by their counsel"). Justice Jackson's concurring opinion stated that the Court "discountenance[d] this practice" of considering an argument not originally pressed by the defendant's own counsel, where those counsel were vigorously contesting the defendants' death sentences. *Id.*, at 292. Far more importantly, however, the Court did not dismiss the application on the ground that the applicant did not satisfy the common-law requirements of next-friend status, but addressed the application on its merits. *Id.*, at 289 *(per curiam).* See also *id.*, at 294 (Clark, J., concurring) ("Human lives are at stake; we need not turn this decision on fine points of procedure or a party's technical standing to claim relief"); *id.*, at 299–300 (Black, J., dissenting) ("I cannot believe . . . that if the sentence of a citizen to death is plainly illegal, this Court would allow that citizen to be executed on the grounds that his lawyers had 'waived' plain error. An illegal execution is no less illegal because a technical ground of 'waiver' is assigned to justify it"); *id.*, at 312 (Douglas, J., dissenting) ("[T]he question of an unlawful sentence is never barred. No man or woman should go to death under an unlawful sentence merely because his lawyer failed to raise the point").

[8] The Court's decision today, which rests on federal common law developed in connection with habeas corpus cases, *ante*, at 164–165, apparently applies to next-friend standing in habeas cases brought in federal district court as well as to petitions for certiorari submitted to this Court. Congress could amend the habeas statute (which provides only that "[a]pplication for a writ of habeas corpus shall be in writing signed and verified by the person for whose relief it is intended *or by someone acting in his be-*

More fundamentally, however, the interest in preventing a suit by an "uninvited meddler" pales in comparison to society's interest in preventing an illegal execution. When, as here, allowing the "meddler" to press the condemned man's interests is the only means by which the Court can prevent an unconstitutional execution, the Court should sacrifice the common-law restrictions rather than the defendant's life.

## IV

The Court today refuses to address a meritorious constitutional claim by rigidly applying a technical common-law rule completely within its power to amend or suspend. It thereby permits States to violate the Constitution by executing willing defendants without requiring minimal assurance that their convictions were correct or their sentences justified. This decision thus continues the Court's unseemly effort to hasten executions at the cost of permitting constitutional violations to go unrectified. See, *e. g.*, *Butler* v. *McKellar*, 494 U. S. 407 (1990); *Teague* v. *Lane*, 489 U. S. 288 (1989). I dissent.

---

*half*," 28 U. S. C. § 2242 (emphasis added)) explicitly to permit next-friend suits in cases of this sort so as to ensure some form of review of capital cases.