*1016 OPINION

Per Curiam:

This is an appeal from a judgment of conviction, pursuant to a guilty plea, of one count of first degree murder and a sentence of death.
On January 4, 1994, the bodies of two U-Haul employees, Peggy Crawford and Keith Christopher, were found at a U-Haul store in Reno. They were hogtied and gagged. Christopher’s head had been crushed by a ballpeen hammer. Crawford’s skull had been impaled with a crowbar/tireiron. $2,400 was missing from the store. Police started to look for Due Cong Hunyh (Due) because he had been fired from that U-Haul store following an altercation with Crawford. The police went to the house where Due lived with appellant, appellant’s sister Maria Calambro (Maria), and Binh Hunyh (Binh). Maria was Due’s “common-law” wife, and Binh was their four-year old son.[1] The police spoke to appellant while Due hid underneath the house.
On January 14, 1994, appellant and Due robbed a gun store at gunpoint, taking two guns with silencers and a laser sight. In the early morning of January 16, 1994, appellant and Due approached Michael McKeen, an employee of the Sacramento Bee, who was filling a newspaper machine. Appellant and Due forced McKeen into the back of McKeen’s pickup truck at gunpoint. Appellant and Due threatened to kill McKeen, took $180 *1017 from his wallet, and made him withdraw $300 from an ATM machine. Appellant and Due showed McKeen how the silencer worked by shooting a post; they also showed him how the laser sight made a red dot on his body. Appellant and Due held McKeen for over eight hours before releasing him in a grape field in Kern County, California. They shook McKeen’s hand, told him it was nothing personal, and drove away in his truck.
Within two hours of releasing McKeen, a police officer observed McKeen’s truck on Interstate 5 in Kern County. Due was driving and appellant was in the passenger seat. After backup arrived, the police officer attempted to stop the truck, but the truck refused to yield. A long, high-speed pursuit ensued. Appellant shot at least thirty rounds at pursuing police officers. Four police vehicles were struck. Appellant shot at a gas tanker truck. Appellant shot at and struck a civilian’s car. The chase ended in downtown Los Angeles when McKeen’s truck collided with a civilian’s vehicle. Thereafter, appellant and Due exchanged more gunfire with police officers before fleeing into the Hall of Records building. Inside, they again shot at pursuing officers. Appellant and Due then took a female security guard hostage. They demanded $500,000 and a Brinks truck. After a nine and one-half hour standoff, appellant and Due surrendered.
Appellant was taken to a hospital, where he confessed to the crime spree. Appellant, however, was equivocal about his involvement in the U-Haul murders. Appellant was subsequently convicted in California, pursuant to a guilty plea, of twenty-nine felony charges arising out of the crime spree.[2] Eight months later, after being extradited to Reno, appellant made a three-hour videotaped confession to the U-Haul murders.
According to appellant, he and Due cased the U-Haul location and waited for a night when Due thought there would be a lot of cash present. On January 3, 1994, appellant and Due entered the U-Haul grounds and hid behind the building. When Crawford came out of the business to lock the gate at the end of the business day, appellant and Due followed her into the building. Appellant carried a shotgun, Due a revolver.
Appellant and Due confronted Crawford and Christopher and made them lie on the floor. Next, Due had Christopher empty the cash drawers and the safe. Christopher was again placed on the floor. Appellant got some rope off a wall and tied Crawford’s *1018 hands to her feet behind her back, i.e. he “hogtied” her. Crawford began to pray. Appellant thought that it was good that Crawford was praying because she would soon see God. Appellant then tied up Christopher similarly before gagging both victims with packing tape.
Next, appellant went in search of weapons and found a large ballpeen hammer and a crowbar/tireiron. Appellant struck Christopher six to ten times in the head with the hammer. Christopher did not die right away. After each hammer blow, Christopher would shake, and appellant would look at Christopher to see if he was still alive. As long as he remained alive, appellant would hit him again. Appellant claimed that after crushing Christopher’s skull with the hammer, he unsuccessfully tried to pry it open. While he was killing Christopher, Crawford was trying to scream, but her mouth was taped shut. Appellant thought this was funny. Appellant then killed Crawford by plunging the crowbar through her skull. The bar pierced Crawford’s brain and exited the far side of her skull. Crawford’s injuries suggested that there may have been several unsuccessful attempts - to drive the crowbar through her head before the successful attempt. Appellant claimed that he also unsuccessfully tried to pry Crawford’s skull apart with his hands.
Appellant stated in his confession that he did not know either of the victims, but he did not like Crawford because Due had told him that she was mean. Appellant did not drink alcohol or use drugs before the robbery because he wanted a clear head. Appellant anticipated killing Crawford and Christopher before he entered the building. Appellant thought about impaling both victims to the wall and eviscerating them.
Appellant was charged with, among other things, two counts of first degree murder. The state sought the death penalty. Appellant pleaded guilty to the count alleging that he murdered Crawford, and not guilty to the count alleging that he murdered Christopher. The district court accepted appellant’s guilty plea on the Crawford count, deferred proceeding on the Christopher count, and held a penalty hearing before a three-judge panel on the Crawford count.
At the penalty hearing, appellant “reluctantly” allowed counsel to present mitigating evidence, but elected to keep silent himself. Family members testified that appellant had witnessed his father sexually and physically abuse his mother and sister. Family members expressed disbelief that appellant could commit these murders. One family member testified that appellant had not received guidance from his parents. Rather, appellant learned about life from watching television. An acquaintance of appellant and Due testified that Due was vindictive and that he was afraid of Due.
*1019 A clinical psychologist who had examined appellant testified that appellant has poor skills for coping with life. According to the psychologist, appellant has a low IQ, but is not typically mentally retarded. Rather, appellant is developmentally immature and childlike. Appellant has little sense of his own self. He does not know what he likes or dislikes about himself or others, has no goals or direction, and is not very well developed as a person. The psychologist attributed this to a lack of attention, love, and stimulation from his parents.
The panel found thirty-one aggravating circumstances: (1-28) that appellant had been previously convicted of twenty-eight felonies involving the use or threat of violence to another; (29) that the murder was committed in the course of a robbery; (30) that the murder involved torture, depravity of mind, or mutilation of the victim; and (31) that the murder was committed at random and without apparent motive. The panel found that appellant’s age was a factor, but that it did not rise to the level of a mitigating factor. The panel found that, although appellant did not have a criminal history prior to the murders, his subsequent crime spree rendered that previous history non-mitigating. The panel found that appellant can reason, tell right from wrong, and is capable of resisting the demands and dictates of other people. The panel concluded that the aggravating factors were not outweighed by mitigating factors and imposed a sentence of death.[3]
Appellant did not file a notice of appeal. Appellant, through counsel, informed the district court that he wanted to waive his appeal and proceed with his execution. Following a hearing, the district court orally concluded that appellant is competent to waive his right to appeal.[4] On April 25, 1995, this court directed the district court to appoint independent counsel to appear on behalf of appellant, and to file points and authorities addressing whether appellant has validly waived appellate review.
On May 26, 1995, appellant’s new counsel filed in this court a memorandum of points and authorities. Counsel states that appel *1020 lant has made a valid waiver of his appeal because appellant understands his circumstances and the consequences of his actions. See Cole v. State, 101 Nev. 585, 588, 707 P.2d 545, 547 (1985) (waiver must be “intelligently made and with full comprehension of its ramifications”). Counsel states that: (1) he interviewed appellant at length; (2) appellant understands that he could appeal his sentence to this court; (3) appellant says that he would appeal if he was innocent, but that he will not appeal because he is guilty; (4) appellant understands that he broke the law, and that the law says he should receive a death sentence; (5) appellant understands and accepts the law’s punishment for his actions; and (6) appellant says that if the law is not carried out, people will not be intimidated by the law.
Having reviewed the record and the pleadings, we conclude that appellant is competent to waive his appeal and that his waiver is valid. See Cole v. State, 101 Nev. 585, 588, 707 P.2d 545, 547 (1985). Our conclusion that appellant effectively waived his appeal, however, is not the end of our inquiry. NRS 177.055(2)[5] requires this court to determine whether the record contains evidence that supports the finding of an aggravating circumstance or circumstances, whether the sentence of death was imposed under the influence of passion, prejudice or any arbitrary factor, and whether the sentence of death is excessive, considering both the crime and the defendant.
Having reviewed the record, we conclude that it contains substantial evidence to support the finding of an aggravating circumstance or circumstances. Further, the record contains no indication that the panel’s sentence was imposed under the influence of passion, prejudice, or any arbitrary factor. Finally, we conclude that appellant’s sentence of death is not excessive, considering both the crime and the defendant.
Accordingly, we affirm appellant’s judgment of conviction and sentence of death.

Following the events described herein, Maria murdered Binh in what she claimed was a suicide pact with Due. Maria is currently imprisoned.

Appellant was convicted of seven counts of attempted murder, nine counts of assaulting a peace officer with a firearm, two counts of assault with a firearm, one count of kidnap for ransom, one count of kidnap for carjacking, one count of kidnap for robbery, one count of carjacking, one count of conspiracy to commit carjacking, two counts of second degree robbery, two counts of shooting at an occupied vehicle, one count of false imprisonment of a hostage, and one count of possession of a silencer.

At the end of the penalty hearing, appellant changed his plea to guilty on the count alleging that he murdered Christopher. The district court accepted the plea. Those proceedings remain pending below.

Although the district court has not entered formal, written findings regarding appellant’s competency, as required by Kirksey v. State, 107 Nev. 499, 814 P.2d 1008 (1991), we conclude that a remand to the district court for the entry of such findings would serve little purpose under the circumstances of this case. The record contains appellant’s canvass and the district court’s subsequent oral findings are clear. Nevertheless, we reiterate that the district court has a mandatory duty to enter written findings regarding competency when a defendant seeks to waive appellate review of a sentence of death.

NRS 177.055(2) provides:
Whether or not the defendant or his counsel affirmatively waives the appeal, the sentence must be reviewed on the record by the supreme court, which shall consider, in a single proceeding if an appeal is taken:
(a) Any errors enumerated by way of appeal;
(b) Whether the evidence supports the finding of an aggravating circumstance or circumstances;
(c) Whether the sentence of death was imposed under the influence of passion, prejudice or any arbitrary factor; and
(d) Whether the sentence of death is excessive, considering both the crime and the defendant.