*963 OPINION
Per Curiam:
Alvaro Calambro (Calambro) faces two death sentences for conviction of two counts of first-degree murder. Lydia Calambro (petitioner), Calambro’s mother, seeks to pursue petitions for habeas relief on his behalf as a “next friend.” We conclude that she has failed to establish standing to do so.

FACTS

Calambro was scheduled to be executed on June 15, 1998. On June 9, 1998, petitioner filed the instant petition on his behalf with this court as a “next friend.” Petitioner also filed a next friend petition with the district court, which denied the petition on June 10, 1998. Petitioner appealed. On June 12, 1998, this court filed an order staying Calambro’s execution and remanding to the district court for an expedited hearing.
Calambro was charged with two counts of first-degree murder for killing Peggy Crawford and Keith Christopher in Reno in January 1994. Calambro initially pleaded guilty to Crawford’s murder and not guilty to Christopher’s. A three-judge panel found Calambro able to reason and tell right from wrong and sentenced him to death for Crawford’s murder. Calambro informed the district court that he wanted to waive his appeal and proceed with his execution. The court concluded that Calambro was competent to waive his right to appeal. Independent counsel was appointed for Calambro. In May 1995, Calambro’s counsel filed in this court a memorandum of points and authorities, stating that Calambro understood his circumstances and the consequences of his actions and had validly waived his appeal. This court concluded that Calambro was competent to waive his appeal and affirmed his conviction and sentence. Calambro v. State, 111 Nev. 1015, 900 P.2d 340 (1995).
In March 1995, Calambro pleaded guilty to the charge of murdering Christopher. At the state’s request, the district court held a competency hearing in January 1996. The court considered testimony by two psychologists who examined Calambro. The court *964 expressly asked Calambro’s three defense counsel if they wished to make any motion regarding Calambro’s competency, and they said no. The court addressed Calambro personally and concluded that he was competent. On July 11, 1996, a second three-judge panel sentenced Calambro to death for Christopher’s murder. This court affirmed in Calambro v. State, 114 Nev. 106, 952 P.2d 946 (1998).
In denying the next friend petition on June 10, 1998, the district court concluded that statutory law precluded next friend status; the court did not reach the issue of Calambro’s competency or even address him. On June 12, 1998, this court remanded to the district court for an expedited hearing at which Calambro could speak and petitioner could make an offer of proof regarding Calambro’s competency and her standing as a next friend.
On June 18, 1998, the state provided petitioner with about 250 pages of Nevada Department of Prison (DOP) medical records on Calambro. On June 19, 1998, the state provided petitioner with evaluations of Calambro made by DOP psychologist William Knapp, Ph.D., on May 30 and June 13, 1998. The district court held the expedited hearing on June 22, 1998.
At the hearing, the district court first questioned Calambro.
COURT: ... Do you understand the English language sufficient to understand my questions?
CALAMBRO: Yeah.
COURT: Do you understand that you are about to be put to death?
CALAMBRO: Yeah.
COURT: Do you understand that you’re being put to death due to your conviction on the charge of murder?
CALAMBRO: Yeah.
COURT: Do you understand that it is possible for you to challenge your conviction and sentence in a post-conviction proceeding?
CALAMBRO: Yeah.
COURT: Do you understand that if you do not pursue that challenge — excuse me. That if you do pursue a challenge to your conviction and sentence, that you would be entitled to a stay of your execution?
CALAMBRO: Yeah.
COURT: Well, understanding your answers to those, do you wish to forgo any further challenges to your sentence of death and in fact be put to death? First, do you wish to forgo any further legal challenges in this case?
CALAMBRO: No.
PESCETTA [counsel for petitioner]: Your Honor, I think that we’re done. Mr. Calambro said he does not wish to *965 forgo further legal challenges, so I think the purpose of this hearing is done.
COURT: I am not sure that Mr. Calambro understood the question. The question, Mr. Calambro, is: do you wish to in fact bring some challenge to your conviction and sentence?
CALAMBRO: No.
COURT: Does that mean you wish to forgo further challenges? The word “forgo” means that you do not wish to bring any further challenges.
CALAMBRO: No.
COURT: Well, in going through the questioning, it was clear that Mr. Calambro answered that he did not wish to pursue any further challenges when asked a simple question. I think there is an issue with regard to the word “forgo” that is confusing. And I really don’t feel that it’s worth pursuing further questioning of Mr. Calambro. He does not wish to pursue further legal challenges. And that’s my finding on that issue, based on the questioning so far.
COURT: Mr. Calambro, I am going to ask you one more question: do you wish to bring a legal challenge to your conviction or your sentence?
CALAMBRO: No.
Petitioner requested that the court ask Calambro if he objected to his mother’s bringing such a challenge. The state objected because this court’s order of remand did not provide for such a question, and the district court refused petitioner’s request.[1]
Clinical psychologist, David L. Schmidt, Ph.D., testified for petitioner. He based his opinion in part on a review of videotaped interviews of Calambro’s relatives and family friends. Schmidt also reviewed Calambro’s DOP medical records and noted two antipsychotic medications, Mellaril and Haldol, prescribed for Calambro at various times from July to November 1997. Calambro was also prescribed Prozac, an antidepressant. At one point, Calambro was prescribed a dosage of Haldol which Schmidt described as “the dose that’s usually given to what we *966 call floridly psychotic individuals, people who are actively difficult to manage, because of a thought disorder that’s out of control.” The medical records also indicated that Calambro sometimes refused to take the medications.
Schmidt reviewed the report by DOP psychologist Knapp, dated May 30, 1998, indicating that Calambro showed marked derealization and depersonalization. Schmidt stated: “Derealization is the belief that things are not real, that the things going on around you are merely an illusion . . . . Depersonalization is an occurrence that’s most easily described as feeling that: I am not really testifying here, I am over there watching myself testify.” Schmidt testified that schizophrenia “waxes and wanes” and that sometimes schizophrenics “are floridly psychotic, meaning they’re actively psychotic. Other times it’s a more residual state, where there isn’t as much manifestation.” According to Schmidt, some schizophrenics have “encapsulated” delusional systems and function well as long as issues relating to that delusion do not arise.
Schmidt met with Calambro on June 18, 1998. At first Schmidt was unable to see Calambro because Calambro refused, but prison authorities later placed Calambro in a visitation room with Schmidt for an hour and a half. Schmidt found that Calambro exhibited “very inappropriate affect” given “the severity of the discussion,” refusing to answer questions, sitting there “with a little cocky grin, and laughing inappropriately at times. Calambro said on three occasions only that he would listen to Schmidt and then would return to his cell and watch TV when Schmidt was done. Schmidt had experience dealing with “elective mutism,” but despite his efforts to get Calambro to talk, Calambro said nothing else. In eighteen years of practice, Schmidt had never before been unable to get a person to respond to at least some of his questions. Schmidt believed that Calambro refused to talk because he had a delusion that talking would allow the psychologist to control his thoughts.
Schmidt testified that a letter written by Calambro resembled “the strange, long, rambling manifestos from people who are schizophrenic” and indicated “a psychotic thought process.” Based on history he received and observation of the videotaped interviews of Calambro’s father, Schmidt concluded that the father’s behavior was consistent with schizophrenia. Having a schizophrenic father increased Calambro’s chances of being schizophrenic tenfold.
Schmidt did not believe that Calambro was capable of understanding and choosing rationally among his legal options; Schmidt believed “that it is probable that [Calambro is] suffering from a mental disorder, probably schizophrenia, that precludes his under *967 standing the nature of what is going on and that this is compounded by his low intellectual functioning.” Having reviewed the information available and spoken with Calambro’s mother, Schmidt did not believe that Calambro understood the concepts of execution and death. Schmidt also stated that he required more time and information to fully assess Calambro.
Gregory Ferebee, staff investigator with the Federal Public Defender’s Office, testified that he prepared the videotaped interviews introduced as evidence and that he required more time to investigate various matters.
Petitioner Lydia Calambro testified. She confirmed that her husband, Calambro’s father, had been hospitalized for mental illness and that he hears voices, laughs for no reason, and otherwise acts strangely. Calambro told her in 1993 that he heard voices also. When she met Calambro at the prison two weeks earlier, he told her that he did not understand what an execution was. Cross-examination by the state revealed that Mrs. Calambro’s command of English was extremely limited.
Finally, Maria Lourdes Bello, Vice Consul for the Philippine Consulate in Los Angeles, testified for petitioner. Pursuant to a request made by petitioner on June 11, 1998, the consulate had been trying to obtain medical and possible criminal records for Calambro’s father from the Philippines, but had not yet been able to.
In a declaration executed on June 3, 1998, psychologist Dr. Patricia Heras concluded, based on her evaluation of Calambro in 1995 and 1996, that Calambro was schizophrenic and that a schizophrenic patient may experience remission of symptoms for a time and then become actively psychotic again. At Calambro’s second penalty hearing in July 1996, Dr. Heras testified that she considered Calambro psychotic when she saw him in September 1995, but found him competent in November 1995 and at the time of the hearing; she felt that the structure of prison life had stabilized him. At that same penalty hearing, psychologist Dr. Jeri Doane diagnosed Calambro “as a probable, possibly incipient schizophrenic.”
An affidavit from Calambro’s trial counsel and psychological evaluations from 1994 and 1995 indicate that Calambro has borderline mental retardation (an IQ of 71 by one test), a psychiatric disorder, and difficulty with English because he moved from the Philippines to the United States when he was ten. The record also indicates that Calambro lied to authorities after his arrest when he told them that he had committed other murders and atrocities.
At the expedited hearing, the state introduced a number of documents as an offer of proof that Calambro was competent. Four of these documents were affidavits by Cynthia Wyett, an investí- *968 gator for the Washoe County District Attorney’s Office. A few days before the hearing, Wyett spoke to DOP Chaplain A1 Fry, Dr. Knapp, and two correctional officers regarding their assessment of Calambro based on their contacts with him. Wyett executed affidavits setting forth what the four prison employees told her. According to Wyett, Chaplain Fry spoke with Calambro on June 3, 1998. Fry and Calambro discussed the upcoming execution, and Calambro said that he wanted to be cremated and have his ashes scattered by Fry. Fry believed that Calambro understood he was about to be put to death, the reason for his execution, and his right to challenge his conviction. Calambro accepted responsibility for his crimes, did not want to live in prison the rest of his life, and professed a Christian belief in life after death. Wyett’s affidavit regarding Knapp’s statements accords with Knapp’s reports, which are discussed below.
The DOP medical records showed that Calambro often complained of audio and visual hallucinations, including voices telling him to hurt himself. At times prison medical personnel considered Calambro to be a suicide risk. Personnel noted times when Calambro paced in his cell most of the night, refused to speak or leave his cell, and displayed flat or inappropriate affect. The records also showed that Calambro told prison personnel that he looked forward to his execution and believed that he deserved to die and that he would rather be dead than remain in prison.
As mentioned above, Dr. Knapp examined Calambro on May 30, 1998. Knapp made a number of observations, including: “Delusions about unrealness of his death,” “Believes that ‘Death is not real. Only pleasure & pain are real,’ ” “Not suicidal at this point,” “[Appearance:] Not normal,” “Eyes are bloodshot,” and “States he is not concerned about being executed.” Nevertheless, Knapp concluded: “No serious mental illness indicated. Severe personality problems. Axis II 301.22 schizotypal pers. disorder plus 301.7 antisocial personality disorder.” Knapp evaluated Calambro again on June 13, 1998, and reported: “A great change from my previous visit — no schizotypal personality symptoms evident,” “Looked normal today — rested, no bloodshot eyes,” “Only talked of coming back from death in the normal Biblical meaning,” and “Very clear understanding of the 2 week execution postponement & that his mother was able to get the court to order a psychological examination.”
At the end of the hearing, the district court found that Calambro understood that he was about to be executed, why he was to be executed, and that he had the right to challenge his conviction and sentence. It also found that Calambro did not wish to raise such a challenge. The court found it “fairly evident” that Calambro had “schizophrenic tendencies,” and it had “little *969 doubt that that would be the case through further research and interviewing done by Dr. Schmidt.” The court found that there was not a sufficient offer of proof to conclude that Calambro “is suffering from such a degree of mental illness that he cannot make an intelligent decision as to whether or not he should pursue post-conviction relief.’ ’ It therefore denied petitioner’s request for next friend status. A written order was entered on June 29, 1998.

DISCUSSION

Whether substantial evidence supports the district court’s finding that Calambro is competent

The Nevada Constitution provides that district courts have the power to issue writs of habeas corpus “on petition by, or on behalf of any person” who is held in custody or has suffered conviction in their districts. Nev. Const. art. 6, § 6, cl. 1 (emphasis added). Therefore, we recognize the possibility of next friend standing and follow Whitmore v. Arkansas, 495 U.S. 149, 161-62 (1990), which sets forth two requirements for such standing. First, a next friend “must provide an adequate explanation-such as inaccessibility, mental incompetence, or other disability-why the real party in interest cannot appear on his own behalf to prosecute the action.” Id. at 163. Second, the next friend “must be truly dedicated to the best interests” of the real party. Id. As part of this second requirement, some courts further require the next friend to have some “significant relationship” with the real party. Id. at 163-64.
The initial question is: what burden of proof was petitioner required to meet to establish standing? According to Whitmore, the next friend has the burden “clearly to establish the propriety of his status and thereby justify the jurisdiction of the court.’ ’ Id. at 164 (emphasis added); cf. Doggett v. Warden, 93 Nev. 591, 595, 572 P.2d 207, 209 (1977) (post-conviction habeas petitioner required to prove by clear and convincing evidence his allegation that he had been incompetent to stand trial).
Citing Whitmore, petitioner asserts that by presenting “meaningful evidence” that Calambro is incompetent, she is entitled to a full evidentiary hearing. Petitioner has apparently fashioned this standard from the United States Supreme Court’s statement in Whitmore that “there was no meaningful evidence that [the real party in interest] was suffering from a mental disease, disorder, or defect that substantially affected his capacity to make an intelligent decision.” Whitmore, 495 U.S. at 166. However, “meaningful evidence” falls short of defining the showing required to earn an evidentiary hearing.
*970 In holding that the Eighth Amendment forbids the execution of an insane person, a four-justice plurality of the Supreme Court went on to say: “It may be that some high threshold showing on behalf of the prisoner will be found a necessary means to control the number of nonmeritorious or repetitive claims of insanity.” Ford v. Wainwright, 477 U.S. 399, 417 (1986) (emphasis added). In concurring, Justice Powell stated:
petitioner does not make his claim of insanity against a neutral background. On the contrary, in order to have been convicted and sentenced, petitioner must have been judged competent to stand trial, or his competency must have been sufficiently clear as not to raise a serious question for the trial court. The State therefore may properly presume that petitioner remains sane at the time sentence is to be carried out, and may require a substantial threshold showing of insanity merely to trigger the hearing process.
Id. at 425-26 (emphasis added) (footnote omitted). Although Wainwright did not address the issue of next friend status, the decision certainly applies with equal if not greater force to assertions of insanity made by a next friend.
Therefore, it is appropriate under Wainwright to require a next friend petitioner to make a high or substantial threshold showing of incompetency to gain a full evidentiary hearing. Although meaningful evidence is certainly necessary for such a showing, whether it is sufficient for such a showing will depend on its strength.
In this case, however, threshold issues had been passed by the time of the expedited hearing, and petitioner was required to make more than a threshold showing at that hearing. In our order of June 12, 1998, we noted that
the allegations set forth in the petition, standing alone, are not sufficient to meet the burden of next friend status under Whitmore. The record of the prior proceedings below and prior proceedings in United States District Court clearly established Calambro’s competence to make decisions with regard to his legal options at that time. Thus, due to the state of current record, the burden is on petitioner to make an offer of proof of sufficient additional legally competent evidence to establish next friend status.
Thus, this court required petitioner to make an offer of proof at the hearing which would establish clearly that Calambro was incompetent.
*971 The state does not dispute that Calambro’s mother is dedicated to his best interests and has a significant relationship with him. Therefore, the question under Whitmore is whether she clearly established in the district court that Calambro is incompetent and cannot appear on his own behalf. The trial court resolves conflicting evidence at a competency hearing, and this court will sustain the trial court’s findings when substantial evidence supports them. Ogden v. State, 96 Nev. 697, 615 P.2d 251 (1980).
Supreme Court case law provides the relevant test of Calambro’s competency. To determine if a condemned habeas petitioner was competent to withdraw his petition for certiorari, the Supreme Court directed the trial court to determine whether the petitioner “has capacity to appreciate his position and make a rational choice with respect to continuing or abandoning further litigation or on the other hand whether he is suffering from a mental disease, disorder, or defect which may substantially affect his capacity in the premises.” Rees v. Peyton, 384 U.S. 312, 314 (1966). A condemned person is sane if “aware of his impending execution and of the reason for it.” Demosthenes v. Baal, 495 U.S. 731, 733 (1990).
Petitioner alleges that Calambro does not understand the role of collateral review of a capital sentence, the distinction between challenging the propriety of his capital sentence and claiming innocence, the fallibility of the state court system, or the effect upon his sentencing proceedings of his misrepresentations to authorities after his arrest. She also alleges that he fails to appreciate that he will die, citing for example Dr. Heras’s opinion in 1995 that Calambro “does not grasp the meaning of death” because his comprehension of it “is limited to repetition of Bible verses.’ ’
However, the relevant consideration is not whether Calambro comprehends post-conviction legal issues in detail or can “grasp the meaning” of death without resorting to Biblical verses. Rather, it is whether he is “aware of his impending execution and of the reason for it,” Demosthenes, 495 U.S. at 733, and “has capacity to appreciate his position and make a rational choice with respect to continuing or abandoning further litigation,” Rees, 384 U.S. at 314.
We conclude that substantial evidence supports the district court’s finding that Calambro’s mental illness has not rendered him incompetent. Petitioner’s evidence includes Dr. Schmidt’s opinion that Calambro is probably schizophrenic, incapable of choosing rationally among his legal options, and unable to understand his execution and death. However, this opinion is somewhat *972 conclusory, based mainly on information gleaned from Calambro’s medical records and statements by relatives such as Calambro’s mother. Schmidt observed Calambro directly for ninety minutes, but Calambro refused to converse with him. Petitioner also stresses Dr. Knapp’s report of May 30, 1998, which stated, among other things, that Calambro believed that “ ‘Death is not real.’ ” On the other hand, Knapp’s report two weeks later stated that Calambro “[o]nly talked of coming back from death in the normal Biblical meaning.”
The three-judge panel that first sentenced Calambro to death found that he could reason and tell right from wrong. This court determined that Calambro was competent to waive his appeal in July 1995, and the district court determined that he was competent in his second sentencing proceedings in January 1996. Dr. Heras, a defense expert, considered Calambro competent at his second penalty hearing in July 1996. Although the district court’s canvass of Calambro at the latest hearing was not extensive, it did cover the critical issues, and Calambro was — apart from his failure to understand the word “forgo” — consistent in indicating that he understood that he would soon be executed but did not wish to pursue post-conviction relief. It appears that Calambro was raised by an abusive, mentally ill father. Calambro also exhibits borderline mental retardation, and the evidence shows that he probably suffers from some degree of schizophrenia. But the evidence also shows that schizophrenics are not necessarily delusional and can be capable of understanding their situation. The prison medical records show, among other things, that Calambro was prescribed antipsychotic medication from July to November 1997 and has a history of hearing voices, but they do not show that he could not distinguish reality from any delusions. The state’s offer of proof included a prison chaplain’s recent observations that indicate that Calambro is basically rational.
Based on our review of the entire record, we conclude that substantial evidence supports the district court’s finding that Calambro is competent.

Whether the proceedings in district court violated petitioner’s procedural rights

Petitioner argues that constitutional due process and NRS 176.425 entitled her to procedural rights which she failed to receive.
NRS 176.425(1) provides that if there is good reason to believe that a person condemned to death has become insane, the DOP Director may petition the district court, alleging that the person is insane, whereupon the court shall hold a hearing to determine the person’s sanity after appointing two psychiatrists or psychologists *973 to examine the person. NRS 176.435 provides that at the hearing the “examining physicians” shall testify and that the attorney general, the district attorney, and the convicted person or his attorney may introduce evidence and cross-examine any witness. Petitioner asserts that under the facts of this case the DOP Director was required to invoke NRS 176.425, which would have required mental health professionals to examine Calambro and provided petitioner with the opportunity to cross-examine those professionals.
NRS 176.425(1) provides that the Director “may” petition the district court to allege that the convicted person is insane. Arguably, therefore, even if an inmate was clearly insane, the Director would have the discretion not to petition the court. However, petitioner argues with some force that interpreting the statute to allow the Director such unfettered discretion would render it unconstitutional. We conclude that we need not decide this issue because in this case Calambro was not clearly insane; rather, the evidence supports a finding that Calambro is competent enough to be executed. Thus, the Director did not violate NRS 176.425 or offend the constitution when he did not invoke the statute’s provisions, and we conclude that petitioner has not shown that she had a right to the procedures set forth in NRS 176.435.
Regardless of the procedures afforded her, petitioner’s main complaint is that she did not receive an adequate opportunity to be heard because this court gave her insufficient time to prepare her case. She points out that the district court stated at the hearing that it had not read every document presented to it, and she claims that she was allowed only “one week’s worth of preparation” before the expedited hearing.
This claim misrepresents the actual state of affairs. Petitioner first asserted next friend status in September 1995 in a federal habeas petition. Thus, the question of Calambro’s competency did not occur only recently to petitioner. Petitioner filed her petition in this case with the district court on June 4, 1998. At that time she should have been prepared to cite significant evidence to support her assertion of next friend status.[2] The expedited hearing *974 occurred eighteen days later, on June 22, 1998, after petitioner’s expert was able to meet with Calambro. Moreover, this court only required petitioner to make an offer of proof at that hearing, not have every witness ready to testify or every document in hand. We conclude that under the totality of the circumstances petitioner received an adequate opportunity to be heard.
Petitioner also accuses the state of ignoring its duty under Brady v. Maryland, 373 U.S. 83 (1963), to disclose material evidence to her. She stresses that the state disclosed Calambro’s medical records only after his scheduled execution date and only days before the expedited hearing. The state notes, however, that petitioner made no requests for discovery, and that the state provided relevant materials to petitioner after this court ruled that she might have standing. Petitioner has not shown that Brady or its progeny apply here, nor has she cited any authority substantiating her argument that the state violated a duty to divulge information in this case.

Whether this court should remand to the district court for further hearings

Petitioner claims that in federal district court on July 17, 1998, she was able to present material evidence which time constraints prevented her from presenting to the state district court. Petitioner states that she will file the transcript of the federal proceedings, when she receives it, and a motion to remand for further hearings before the state district court. We conclude that petitioner has not presented cause for remand pursuant to SCR 250(IV)(H) and therefore decline to remand this case.

CONCLUSION

Substantial evidence supports the district court’s finding that Calambro is competent; therefore, petitioner lacks standing to file a next friend petition. Accordingly, we affirm the district court’s order denying her post-conviction petition for a writ of habeas corpus, and we deny her original petition for a writ of habeas corpus.

 The state and the district court apparently assumed that the district court was authorized to address Calambro regarding only the issues specifically covered in this court’s order of June 12, 1998, and using only the language found in that order. But nothing in our order restricted the district court in this manner. On the contrary, when a person’s competency and desire to pursue postconviction relief are central issues, the trial court should question that person freely and attempt to elicit the person’s own views and words on the proceedings and any other relevant matters.

 When she filed her petition, petitioner alleged that Calambro had not communicated with her or with his attorneys for almost two years. This circumstance helps explain why petitioner wants more time to gather evidence, but because this lack of communication appears to be by Calambro’s choice, we conclude that this circumstance, while relevant, is not sufficient to entitle her to more time. Of course, if it appeared, for example, that prison authorities were blocking access to an inmate or that an inmate was comatose, the inability to communicate with the inmate would mandate a grant of more time to investigate.