Springer, C. J.,
dissenting:
This is a particularly cruel, gruesome and uncalled for homicide. My heart goes out to the victims. There is substantial pressure on the court to hurry this execution. We receive letters from individual citizens, and editorials have appeared in the papers urging that Calambro be executed posthaste. Victims of the crime have, quite understandably, expressed publicly their impatience *975 with the judicial system; and I can certainly understand the anxiety expressed by members of this court about getting the matter behind us. All of this, of' course, calls for special caution and reserve on the part of judicial officers that they not be influenced by the kinds of pressures that I have described. It is clear to me that Calambro, who is, undeniably, suffering from some degree of mental illness, has the right of judicial review by way of habeas corpus brought by his mother as “next friend.” This court’s affirming the trial court’s dismissal of Mrs. Calambro’s habeas corpus petition means that the vital question of whether Calambro has, as his mother claims, become insane since the time that he was condemned to death (and could not, therefore, be lawfully executed) will never be considered by a reviewing Nevada court.
My position is a rather simple one, namely this: Because the Nevada Constitution and laws do not permit the execution of an insane person, the question of whether Calambro (who is con-cededly “mentally ill”) is insane should be carefully examined by the court in habeas corpus proceedings. In denying habeas corpus review, this court appears to me to be saying, “This man says he wants to die; so let’s take him at his word and let him die,’ ’ ignoring the obvious: It is not reasonable to “take the word” of a mentally ill person at face value. Refusal by the district court and this court to address the essential question of Calambro’s legal capacity to be put to death must, under the circumstances, be perceived as a rush to judgment, an appetence to do away with, as quickly as possible, “a murderer who wants to be punished for his crime” and who “is supposed to be dead by now.”[1] Letters have come to members of the court urging that there be no delay in this execution, and letters to the editor and news commentary, it seems to me, have given this case more attention than many other murder cases that have been processed by this court. It is difficult to avoid the conclusion that the court’s inexplicable willingness to order the death of a mentally ill person without adjudicating his legal capacity results from the court’s having succumbed to public clamor and media pressure. There is little else that would explain what is happening in this case.
Calambro’s mother brought these habeas corpus proceedings in her name, maintaining that her son is insane and that, therefore, her son cannot, while insane, be lawfully executed. NRS 176.425(1) furnishes a procedure under which the prisons director can call to the attention of the court instances in which a person condemned to death “become[s] insane” and cannot, *976 therefore, be lawfully executed. In such cases, the director may petition the court “alleging the present insanity of such person.” In the case before us we have a condemned man who is mentally retarded, psychotic and not fluent in the English language. Virtually all of the testimony before the trial court points to the conclusion that Calambro is “mentally ill,” insane. It is very hard to deny that Calambro is a man desperately in need of some help in our judicial system and that he is plainly incapable of acting on his own behalf. The prisons director in this instance has not seen fit to file a petition to inquire into the “present insanity” or sanity of Calambro; so Calambro’s mother filed a habeas corpus petition on Calambro’s behalf. The district court ruled, in effect, that Calambro is not crazy enough to permit his mother to represent him in this fashion and dismissed the habeas corpus petition. This court now affirms the district court’s ruling, thus denying a sanity hearing relating to a person who from all indication has “become insane,” at least intermittently, since the time of his sentencing. NRS 176.425.
Although the trial court (incorrectly, I think) concluded that “the degree of mental illness” suffered by Calambro was not sufficient to justify his mother’s proceeding on his behalf, it did not decide that Calambro was competent in the sense that he was “executable.” Unfortunately, this issue will never be decided by our State courts. It must be remembered that the only issue before the district court was whether Mrs. Calambro was or was not able to “provide an adequate explanation” of why her son “cannot appear on his own behalf to prosecute the action.” Whitmore v. Arkansas, 495 U.S. 149, 163 (1995) (citations omitted). The question before the district court, and before this court, then, is not, as adjudicated by the majority opinion, that Calambro was competent but, rather, whether Mrs. Calambro’s explanation was adequate. Mrs. Calambro’s explanation of why her son was not able, not “competent,” to pursue the writ in his own right and on his own behalf is based upon her son’s long history of schizophrenia and “psychotic thought process,” aggravated by a 71 I.Q. and his difficulty with the English language. Calambro’s mental problems are complicated by the fact that, all agree, his condition “waxes and wanes” — there are times when he is “floridly psychotic” and kept under heavy anti-psychotic medication, when he is without an “understanding of what is going on” and when he refuses to talk because he believes that, by doing this, the one to whom he is talking will be able to “control his thoughts.” Again, there are times when he is in “remission” and looks “normal.” Mrs. Calambro is merely asking the courts to determine in habeas corpus proceedings whether her son’s condition, her son’s insanity, incompetency, psychosis, schizophrenia — however you want to *977 put it — is such that it would be violative of our laws and constitution to put him to death. I cannot understand why she is not being permitted to do what she is obviously entitled to do under the circumstances of this case.
On the day of Calambro’s hearing, the trial judge did not fail, and could not have failed, to recognize that Calambro was suffering from a degree of mental disorder and deficiency. The trial judge took note of Calambro’s “schizophrenic tendencies” and saw that Calambro suffered from at least some “degree of mental illness.” Calambro’s mental illness, at that particular time and place, did not, apparently, strike the trial judge as being of a sufficient “degree” as to keep Calambro from making “an intelligent decision as to whether or not he should pursue post-conviction relief.” Put in another way, what the court was really saying was that mentally retarded, delusional, schizophrenic, language-handicapped Calambro did not need his mother’s help; that Calambro was capable of making intelligent, life-or-death decisions and possessed sufficiently mature judgment and understanding of the proceedings and the language of the proceedings so that he could, as he told prison officials, “look[j forward to his execution.” I do not think so.
Given Calambro’s history of insanity and mental retardation, I cannot even guess as to how the district court could have arrived at the conclusion that Calambro was not in obvious need of having a “next friend” carry forward habeas corpus proceedings on his behalf and to allow for a complete and orderly judicial review of the legality and constitutionality of executing a person suffering from delusional schizophrenia and the other mental disorders described in the proceedings conducted by the district court. It is readily apparent from the record before the district court that Calambro was suffering from a “degree of mental illness” that demands that habeas corpus proceedings be carried out by someone other than Calambro, on his behalf. I respectfully suggest that the trial judge would have been better advised to decide the matter along the following lines:
“All of the experts say that this man is schizophrenic” but that he does have some “normal” moments. The only issue before the court today is whether Mrs. Calambro has presented an “adequate explanation” to support her bringing this petition in her son’s stead. Given the psychiatric history and uncontradicted evidence of schizophrenia and psychotic disorders, justice and fairness demands that these habeas corpus proceedings be pursued by someone other than Calambro himself. I have said that I want to have “further research and interviewing done by Dr. Schmidt” and others so that a fair and complete determination can be made as to whether the *978 defendant is sufficiently sane so as to justify putting him to death. Only after a full hearing on this issue can I responsibly decide whether Calambro is sane or insane, a determination that should be made in a manner comparable to the procedures provided for in NRS 176.425. We have before us a mentally retarded, delusional, psychotic man who claims that he wants to die and that he is looking forward to it. This court concludes that in the face of overwhelming evidence of Calambro’s multiple mental disorders and language disabilities, Mrs. Calambro must be allowed to proceed with the writ of habeas corpus, brought on her son’s behalf.
A majority of this court intimates that if we permit this mother to proceed on behalf of her son, we will be inviting future “non-meritorious or repetitive claims of insanity.” Such a concern cannot arise from the kinds of facts that are present here; but the suggestion prompts me to offer a brief overview of what I see as being the uncontradicted evidence presented to the trial court:
1. Calambro is “suffering from a mental disorder, probably schizophrenia.”
2. Calambro’s mental disorder “precludes his understanding the nature of what is going on.”
3. Calambro’s mental disorder is “compounded by his low intellectual functioning.” (71 I.Q.)
4. Calambro “refused to talk because he had a delusion that talking would allow the psychologist to control his thoughts.”
5. Calambro displayed a “psychotic thought process.”
6. Calambro’s father is schizophrenic, which “increased Calambro’s chances of being schizophrenic tenfold.”
7. Calambro has been on Haldol (“fifty times more potent than Mellaril,” another anti-psychotic drug), a very powerful anti-psychotic drug, in a “dose that’s usually given to what we call floridly psychotic individuals, people who are actively difficult to manage, because of a thought disorder that’s out of control.”
The aspect of Calambro’s “mental illness” that is deserving of most attention is the intermittent, episodic nature of his mental illness. Dr. Heras, based on her evaluation of Mr. Calambro, testified that Mr. Calambro is a schizophrenic and, significantly, that a “schizophrenic patient may experience remission of symptoms for a time and then become actively psychotic again.” An interval of remission was put poignantly by prison doctor Knapp: “[He ljooked normal today.”
When the time comes (and I believe it will) when Calambro is given a habeas corpus hearing on the issues raised by his mother, *979 the courts must deal with the problem: ‘ ‘What do you do with a person that is sane today, concededly crazy tomorrow and sane the next day?” Such a question goes beyond the scope of this dissent; but it does show the depth of the problems that must be addressed when this matter comes to a full habeas corpus hearing.
I have called Mrs. Calambro’s “adequate explanation” of the need to pursue a habeas corpus writ on her son’s behalf as being “uncontradicted” because the State’s case does not offer any firm contradiction of the proposition that Calambro is not mentally and otherwise capable of pursuing the matter on his own. Prison records offered to the district court by the State reveal that Calambro “often” suffered from “audio and visual hallucinations,” including “voices telling him to hurt himself,” that he “looked forward to his execution” and was “not concerned” about it. It is difficult for me to understand why the courts of this state would deny judicial review of the death sentence of the man described in this record.[2]
Referring again to Justice Shearing’s dissent in Whitehead, above, Justice Shearing quoted Chief Justice Burger with approval, remarking that “it is assumed that judges will ignore the public clamor or media reports and editorials in reaching their decisions and by tradition will not respond [react] to public commentary.” Id. at 231, 893 P.2d at 967. The justice’s comment brings to my mind the motto of this court: “Fiat justicia ruat coelum” — “Let justice be done, though the heavens fall.” These words were delivered by Lord Mansfield, Lord Chief Justice, in the case of Rex v. Wilkes, 4 J. Burrow 289 (K.B. February 5, 1770). To put Lord Mansfield’s words, adopted by this court as its motto, into context, let me say something about the setting in which Lord Mansfield pronounced these words. The subject of the hearing before Lord Mansfield was a criminal action against a very popular member of Parliament, John Wilkes. Wilkes, charged with outlawry, had very strong popular support and members of the court had received a number of letters in support of Wilkes, some threatening the justices’ lives. Wilkes was strongly supported by the press. Mobs rioted in Wilkes’ support, and their clamor was audible in the court room while Lord Mansfield was delivering his judgment. Lord Mansfield paused for a moment:
*980 But here let me pause!—
It is fit to take some notice of the various terrors hung out; the numerous crowds which have attended and now attend in and about the hall, out of all reach of hearing what passes in Court; and the tumults which, in other places, have shamefully insulted all order and government. Audacious addresses in print dictate to us, from those they call the PEOPLE, the judgment to be given now, and afterwards upon conviction. Reasons of policy are urged, from dangers to the kingdom, by commotions and general confusion.
Give me leave to take the opportunity of this great and respectable audience, to let the world know, all SUCH attempts are VAIN. Unless we have been able to find an error which bear us out, to reverse the outlawry, it must be affirmed. The constitution does not allow reasons of state to influence our judgments: God forbid it should! We must not regard political consequences, how formidable soever they might be; if rebellion was the certain consequence, we are bound to say, “Fiat justicia mat coelum.”
I pass over the many anonymous letters I have received. Those in print are public; and some of them have been brought judicially before the Court. Whoever the writers are, they take the wrong way. I will do my duty, unawed. WHAT am I to fearl That mendax infamia from the press, which daily coins false facts, and false motives? The lies of calumny carry no terror to me. I trust that my temper of mind, and the coulour and conduct of my life, have given me a suit of armour against these arrows. I wish POPULARITY; but it is that popularity which follows, not that which is run after. It is that popularity which, sooner or later, never fails to do justice to the pursuit of noble ends, by noble means. I will not do that which my conscience tells me is wrong, upon this occasion, to gain the huzzas of thousands, or the daily praise of all the papers which come from the press: I will not avoid doing what I think is right, though it should draw on me the whole artillery of libels; all that falsehood and malice can invent, or the credulity of a deluded populace can swallow.
Rex v. Wilkes, 4 J. Burrow 289, 314-315 (K.B. 1770) (emphasis in original).

 Jeff Ackerman, A parent is ready for justice, a killer is ready to die, Nevada Appeal, September 1, 1998. This case has elicited considerably more “public clamor and media reports and editorials” than is usually seen. Whitehead v. Nevada Comm’n on Judicial Discipline, 111 Nev. 70, 893 P.2d 866 (1995) (Shearing, J., dissenting).

 I note that after much wrangling and leading (brought about largely because, in addition to being mentally retarded and schizophrenic, Calambro can barely speak English), the district judge finally got Calambro to say “No” to the question, “[D]o you wish to bring a legal challenge to your conviction or your sentence?” Calambro’s attorney then asked the court to ask Calambro the rather simple question of whether or not Calambro wanted his mother to challenge his sentence. The court would not permit the question; so we do not know whether Calambro was willing to have his mother act on his behalf or not. Even the majority admits that this was a mistake.