# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

--------

Argued September 14, 2004          Decided December 17, 2004

No. 03-5234

SECURITIES AND EXCHANGE COMMISSION,
APPELLEE

v.

LOVING SPIRIT FOUNDATION INC. AND
PUMA FOUNDATION, LTD.,
APPELLANTS

PAUL A. BILZERIAN, ET AL.,
APPELLEES

--------

Appeal from the United States District Court
for the District of Columbia
(No. 89cv01854)

--------

*David A. Maney*, *pro hac vice*, argued the cause for
appellants. On the brief was *G. Michael Nelson*.

*Charles B. Wayne* argued the cause and filed the brief for
appellee Deborah Meshulam, in her capacity as receiver of the
*Securities and Exchange Commission v. Paul A. Bilzerian, et al.*,
Civil Action No. 89-1854 (SSH) Receivership Estate.

Before: SENTELLE, HENDERSON, and TATEL, *Circuit*

*Judges*.

Opinion for the Court filed by *Circuit Judge* TATEL.

TATEL, *Circuit Judge*:  In this case, we consider challenges to a pair of district court orders:  one defines the obligations of a court-appointed receiver, and the other denies a motion to recuse the district judge.  Finding error in neither ruling, we affirm in all respects.  Also, because appellants' lawyers, G. Michael Nelson and David A. Maney, may have violated ethical obligations binding on attorneys practicing in the federal courts, we will order them to show cause why sanctions should not be imposed.

## I.

In 1989, a jury sitting in the United States District Court for the Southern District of New York convicted Paul A. Bilzerian of securities fraud and conspiracy to defraud the United States. *See United States v. Bilzerian*, 926 F.2d 1285, 1289-91, 1294 (2d Cir. 1991) (opinion of Cardamone, J.) (affirming the conviction).  Bilzerian was sentenced to four years imprisonment and fined $1.5 million.  *Id*.  Following his conviction, the Securities and Exchange Commission filed a civil suit against Bilzerian in the United States District Court for the District of Columbia.  That court ordered Bilzerian to disgorge over $62 million, representing profits from his fraudulent activities and prejudgment interest. *SEC v. Bilzerian*, 814 F. Supp. 116 (D.D.C 1993) (ordering disgorgement of profits), *aff'd* 29 F.3d 689 (D.C. Cir. 1994); *SEC v. Bilzerian*, No. 89-1854, 1993 WL 542584 (D.D.C. June 25, 1993) (setting value of interest).  Seven years later, with the judgment still unpaid, the district court found Bilzerian in contempt of the disgorgement order, *SEC v. Bilzerian*, 112 F. Supp. 2d 12 (D.D.C. 2000), *aff'd* 2003 WL 22176183 (D.C. Cir. Sept. 22, 2003), established a receivership estate "for the purpose of identifying, marshalling, receiving, and liquidating his assets,"

*SEC v. Bilzerian,* 127 F. Supp. 2d 232, 232 (D.D.C. 2000)*,* appointed appellee Deborah Meshulam as receiver, *id*., and sent Bilzerian back to prison for continued noncompliance, *SEC v. Bilzerian*, No. 89-1854 (D.D.C. Jan. 12, 2001).

Appellants Puma Foundation and Loving Spirit Foundation are nonprofits directed by Bilzerian's wife, Terri Steffen. When the receiver discovered that Bilzerian had a financial interest in the two foundations, which shared an address with the Bilzerian-Steffen residence in Tampa, Florida, the district court froze the foundations' assets and ordered them turned over to the court. *SEC v. Bilzerian*, No. 89-1854 (D.D.C. May 11, 2001) (order granting ex parte temporary asset freeze and other relief); *SEC v. Bilzerian*, No. 89-1854 (D.D.C. June 1, 2001) (order granting preliminary possession).

Later, in December 2001, the receiver entered into a consent agreement with Steffen, Puma, Loving-Spirit, and several other Bilzerian-related entities pursuant to which many of the funds and assets they once held (and that were then in the court's registry) were to be transferred to the receiver. One such asset was a large block of stock in Cimetrix, Inc., a publicly traded company once run by Bilzerian. The agreement also called for the sale of the Bilzerian-Steffen residence pursuant to the terms of a separate "Joint Marketing Agreement." Steffen and the receivership estate would split the proceeds of the sale evenly. Finally, the consent agreement provided that once the IRS released the two foundations' tax liabilities, their assets would be donated to the Salvation Army.

Central to this case, one paragraph in the consent agreement called for the settling parties to execute a series of liability releases. Steffen, a trust, and several holding entities agreed to execute releases in favor of Cimetrix. The agreement also provided that Cimetrix, though neither a party to the litigation nor a signatory to the agreement, would "execute a release in favor of Steffen, the Entities, the Foundations, and [another

Bilzerian-related entity] in form acceptable to them." After the parties signed the agreement, Cimetrix executed releases in favor of various Bilzerian-related entities—but not Puma or Loving Spirit.

Along with the consent agreement, the parties executed an escrow agreement. Under that agreement, the receiver's law firm, as escrow agent, would hold all documents not filed with the court until entry of the consent judgment. Once the court entered a final judgment, the escrow agent would transfer certain documents, including the "third party releases involving . . . Cimetrix" to "counsel for the released parties."

Acting pursuant to the consent agreement, the district court entered judgment in January 2002. *SEC v. Bilzerian*, No. 89-1854 (D.D.C. Jan. 16, 2002). The judgment incorporated the consent agreement by reference, making its provisions orders of the court. *Id*., slip op. at 10. Finding the disgorgement agreed to by the parties sufficient to purge Bilzerian's contempt, the court released him from prison. *Id*.

The consent agreement and judgment, however, failed to bring the receivership proceeding to a close. Over a year after entry of the judgment, in March 2003, Puma and Loving Spirit sued Cimetrix in the United States District Court for the Middle District of Florida, alleging breach of contract and securities fraud. Cimetrix raised several counterclaims, making its failure to release the foundations a matter of immediate concern to them. In a letter to receiver Meshulam, Steffen asserted that the consent agreement required the receiver to procure the unexecuted releases and demanded to know by the end of business that day whether the receiver would do so. Reiterating her demand two days later, Steffen added that "[t]ime is of the essence because Puma and Loving Spirit Foundation will be required to incur substantial additional legal fees in the event I do not receive assurance from you by close of business today that the requested releases will be forthcoming shortly." Hours

later, Steffen emailed an attorney for the receiver, threatening that "if I do not receive the Cimetrix releases by the close of business tomorrow, I will be forced to take drastic action." Steffen added that she would "at the very least, be forced to assume that the entire settlement was the result of fraud on the part of the Receiver and the SEC and that the entire agreement should be rescinded." *Id*.

In response, receiver Meshulam filed a "motion to enforce," asking the district court to clarify whether she had any obligations with regard to the unexecuted releases and warning that Steffen had a history of obstruction that made her threat of "drastic action" particularly serious. Fearing that Steffen might use the releases as an excuse to impede the sale of the Florida property, the receiver also sought an order forbidding Steffen from obstructing marketing efforts in certain specified ways. The two foundations responded that the consent agreement, properly interpreted, required the receiver to obtain the releases. Acting alone, Puma also moved to recuse the district judge, the Honorable Royce C. Lamberth. Puma sought recusal under both 28 U.S.C. § 144, which provides that a judge with "personal bias" shall cease presiding over a case when a party documents the bias in an affidavit, and 28 U.S.C. § 455(a), which provides that a judge "shall disqualify himself" when "his impartiality might reasonably be questioned."

Judge Lamberth denied Puma's motion to recuse. He found the section 144 motion untimely and concluded that the section 455(a) motion fell short of the legal standard required for recusal. *SEC v. Bilzerian*, No. 89-1854 (D.D.C. June 11, 2003). Judge Lamberth also granted the relief receiver Meshulam requested, observing that nothing in the consent agreement gave the receiver any obligation to procure releases from Cimetrix. *SEC v. Bilzerian*, No. 89-1854, slip op. at 3-5 (D.D.C. July 17, 2003). As the agreement explicitly assigned other obligations to named individuals and entities, Judge Lamberth added, it

would have been equally explicit about the receiver's obligation to obtain releases from Cimetrix had the parties actually intended to assign her that task. *Id*. at 4.

Puma and Loving Spirit now appeal, arguing that the receiver lacked standing to bring her motion to enforce. On the merits, they argue that the district court incorrectly interpreted the consent agreement's provision concerning the Cimetrix releases. Puma challenges Judge Lamberth's decision not to recuse himself. We address each contention in turn.

## II.

"Nowhere in the Motion to Enforce," Puma and Loving Spirit argue, "does Meshulam identify any provision of the Consent Judgment that the Foundations violated." Appellant's Br. at 7. According to the two foundations, the receiver filed the motion "solely because the Foundations threatened to take action." *Id*. "Allegations of possible future injury," they conclude, "do not satisfy the requirement of Article III." *Id*. at 8 (quoting *Whitmore v. Arkansas,* 495 U.S. 149, 158 (1990)). This argument is frivolous.

To begin with, Steffen's threats to take "drastic action," including rescinding the consent agreement if the receiver failed to procure the releases immediately, easily satisfy Article III's requirement that "alleged harm . . . be actual or imminent, not 'conjectural' or 'hypothetical.'" *Whitmore*, 495 U.S. at 155 (internal citations omitted). More important, we think the receiver did not even need Article III standing to pursue her motion to enforce. Neither a plaintiff nor a defendant, the receiver functions as an arm of the court, *Phelan v. Middle States Oil Corp.*, 154 F.2d 978, 991 (2d Cir. 1946), appointed to ensure that prevailing parties can and will obtain the relief it orders, *see generally* 13 James Wm. Moore et al., Moore's Federal Practice ¶ 66.03[3] (3d ed. 2000). A "receiver's authority," therefore, "is defined solely by the order of the

appointing court," *id*. ¶ 66.04[1][b], which may "provide for the administration of the receivership in any way it sees appropriate." *Id*. ¶ 66.06[4][a]. The district court, moreover, retains "equitable power to review the actions of [a] receiver." *Fed. Home Loan Mortgage Corp. v. Spark Tarrytown, Inc.,* 829 F. Supp. 82, 85 (S.D.N.Y. 1993) (internal quotation marks and citations omitted).

In this case, receiver Meshulam's motion to enforce sought clarification of responsibilities imposed upon her by the district court in the 2002 consent judgment, a judgment that kept "[t]he Receivership Orders . . . in full force and effect," *SEC v. Bilzerian*, No. 89-1854, slip op. at 10 (D.D.C. Jan. 16, 2002). When Steffen threatened to withdraw from the court-approved settlement agreement if the receiver failed to obtain the Cimetrix releases, the receiver, seeking to preserve the agreement, asked the court for guidance on whether she had any obligation to obtain the releases. In doing so, the receiver was fulfilling her obligation to protect and preserve the receivership estate—an action that implicates no Article III considerations. In ruling on the motion, moreover, the district court exercised its "extremely broad" supervisory power over an ongoing receivership proceeding. *SEC v. Hardy*, 803 F.2d 1034, 1037 (9th Cir. 1986). We thus turn to the foundations' challenge to the district court's interpretation of the consent agreement.

## III.

Reviewing the district court's decision de novo, *Richardson v. Edwards*, 127 F.3d 97, 101 (D.C. Cir. 1997) (explaining that we review the interpretation of a consent agreement de novo), we agree that the receiver has no obligation to procure the releases from Cimetrix. The agreement discusses releases only once, in paragraph thirteen. With respect to the specific releases at issue here, paragraph thirteen provides: "Cimetrix will execute a release in favor of Steffen, the Entities, [and] the

Foundations . . . in form acceptable to them." As the district court suggested, this language is unambiguous. *SEC v. Bilzerian*, No. 89-1854, slip op. at 3-5 (D.D.C. July 17, 2003). The clause says only that "Cimetrix will execute" the releases. Nowhere does it say that the receiver must procure the releases. In fact, even though other provisions of paragraph thirteen impose specific obligations on the receiver, the provision relating to the Cimetrix releases makes no reference to the receiver at all. At oral argument, counsel for the foundations, Mr. Maney, admitted as much: "As a matter of fact," he explained, "there's nothing [in the text of the agreement] that requires the receiver to get the release." Tr. of Oral Arg. at 23.

In addition to running counter to the agreement's text, the foundations' interpretation makes no sense. Receiver Meshulam rightly points out that, "as a fiduciary to the District Court and the Receivership Estate, there is no reasonable basis to presume that the Receiver could represent, in any capacity, the interests of the Foundations, entities she had been investigating and as to which she was adverse." Appellee's Br. at 20. Moreover, "nothing in the record . . . suggest[s] that the Receiver would have any understanding of the form, breadth and scope of releases the Foundations wanted from Cimetrix." *Id*. at 22.

Faced with these facts, the foundations offer four arguments for their interpretation of the agreement, none of which merits serious consideration. First, because nothing in the consent agreement requires them to release Cimetrix, they ask, "with what did the district court expect the Foundations to 'negotiate' with Cimetrix?" Appellant's Br. at 10. A release, however, is not the only consideration the foundations could offer in exchange for the release they seek. In any event, the foundations' doubts about whether *they* can obtain a release fall far short of the evidence they would need to overcome the fact that nothing in the agreement requires the *receiver* to obtain it. Second, claiming that the receiver was Cimetrix's controlling

shareholder, the foundations argue that "she was . . . in a position to cause the releases to be signed by Cimetrix." *Id.* at 10-11. In the district court, however, the foundations offered no evidence to support this claim, and the receiver tells us that "[i]n fact, the Receiver is not a 'controlling shareholder' of Cimetrix." Appellee's Br. at 21. Insisting otherwise, the foundations attach Cimetrix's April 15, 2003 proxy statement to their reply brief, asking us to "take judicial notice of" it. Appellant's Reply Br. at 9. This argument is doubly waived: not only did the foundations fail to present the proxy statement to the district court, *see United States v. Thomas*, 114 F.3d 228, 250 (D.C. Cir. 1997) (noting that when an "argument was not raised below, we consider it waived"), but as counsel should know, this court does not consider arguments first offered in a reply brief. *See Power Co. of Am., L.P. v. FERC*, 245 F.3d 839, 845 (D.C. Cir. 2001). The foundations' final two arguments—that they could not be obliged to procure the releases because the escrow agreement provides that the receiver's "law firm (not the Foundations) was responsible for delivering the Cimetrix Releases to counsel for the Foundations," Appellant's Br. at 11, and that the district court should have conducted an evidentiary hearing—are likewise waived. In the district court, the foundations neither relied on the escrow agreement nor pointed to any other extrinsic evidence that would have required an evidentiary hearing. *See SEC v. Bilzerian*, No. 89-1854, slip op. at 4 (D.D.C. July 17, 2003) (noting that "no extrinsic evidence has been offered to support" the foundations' interpretation of the consent agreement).

## IV.

This brings us to Puma's motion to recuse. According to Puma, a series of Judge Lamberth's rulings, beginning over two years before the foundation filed its motion, show "personal bias," requiring recusal under 28 U.S.C. § 144. Puma also contends that the rulings would lead a reasonable person to

question Judge Lamberth's impartiality, thereby requiring recusal under 28 U.S.C. § 455(a).

*28 U.S.C. § 144*

To recuse a judge under section 144, a litigant must submit, along with its motion, an affidavit stating "the facts and the reasons for the belief that bias or prejudice exists." 28 U.S.C. § 144. The affidavit, which "shall be accompanied by a certificate of counsel of record stating that it is made in good faith," must be "timely." *Id*. Crucial to the integrity of the judicial process, the timeliness requirement ensures that a party may not wait and decide whether to file based on "whether he likes subsequent treatment that he receives." *In re United Shoe Mach. Corp*., 276 F.2d 77, 79 (1st Cir. 1960).

Puma submitted its motion in June 2003, together with an affidavit from Terri Steffen and a certificate from attorney G. Michael Nelson. Observing that approximately eight months had passed since the last of the rulings complained of, Judge Lamberth dismissed the motion as untimely. *SEC v. Bilzerian*, No. 89-1854 (D.D.C. July 11, 2003).

This Circuit has never articulated the standard by which it will review denial of a section 144 motion to recuse. Most circuits review for abuse of discretion. *See, e.g., Jones v. Pittsburg Nat'l Corp.*, 899 F.2d 1350, 1356 (3d Cir. 1990); *United States v. Owens,* 902 F.2d 1154, 1157 & n.2 (4th Cir. 1990). Others review de novo. *See, e.g., United States v. Sykes*, 7 F.3d 1331, 1339 (7th Cir. 1993). In this case, we need not decide which standard to adopt, for even reviewing de novo we can easily sustain Judge Lamberth's decision.

Although section 144 requires the affidavit to be filed "not less than ten days before the beginning of the term at which the proceeding is to be heard, [unless] good cause shall be shown," the statute says nothing about what the timeliness requirement

means where, as in this case, the recusal motion rests on events occurring after proceedings began.  In such circumstances, some courts have required the affidavit to be filed "at the earliest moment." *E.g., Sykes*, 7 F.3d at 1339 (citations omitted); *James v. District of Columbia*, 191 F. Supp. 2d 44, 47 (D.D.C. 2002) (quoting *Sykes*, 7 F.3d at 1339).  In the cited Seventh Circuit decision, an affidavit filed two months after the allegedly prejudicial statement was considered untimely.  *See Sykes*, 7 F.3d at 1339.  Sitting en banc, this court expressed "serious doubt" about the timeliness of an affidavit based on remarks the judge made "more than two weeks before" and a law review article he published "more than a year" earlier.  *Smuck v. Hobson*, 408 F.2d 175, 183 (D.C. Cir. 1969) (en banc).  We have found no case, nor has Puma cited one, permitting a delay as long as the one in this case, where Puma waited two years after the first order it complains of and over six months after the last.

During its long delay, moreover, Puma made over a dozen filings in the proceedings before Judge Lamberth, and consistent with the policy underlying the timeliness requirement, courts have observed that filing motions between the events complained of and submission of the affidavit weighs heavily against a finding of timeliness.  *E.g., Smith v. Danyo*, 585 F.2d 83, 86 (3d Cir. 1978).  Indeed, during the period of time at issue in this case, Puma consented not only to have judgment entered against it, but also to the district court's continuing jurisdiction.  Why, then, did Puma wait so long to file its motion and affidavit?  Was it waiting to see "whether [it] like[d] the subsequent treatment that [it] receive[d]"?

Puma offers two entirely unconvincing explanations for its tardiness.  First, it tells us that it could not seek recusal earlier for want of a lawyer—a situation it blames on the district court's asset freeze.  Yet Puma had counsel at various times between the events described in the Steffen affidavit and the time it filed the affidavit.  Its assets, moreover, were not frozen during the five

months immediately preceding the filing of the recusal motion. Second, Puma alleges that the receiver's motion to enforce initiated a new proceeding, and that it moved to recuse as soon as that proceeding began. As we explained, however, the motion was part of the same receivership proceeding that had been ongoing for several years. *Supra* at 7. Given these circumstances, the motion and affidavit were plainly untimely.

## *28 U.S.C. § 455(a)*

Section 455(a) permits a litigant to seek recusal of a judge "in any proceeding in which his impartiality might reasonably be questioned." In assessing section 455(a) motions, this circuit applies an "objective" standard: Recusal is required when "a reasonable and informed observer would question the judge's impartiality." *United States v. Microsoft Corp.*, 253 F.3d 34, 114 (D.C. Cir. 2001) (en banc) (per curiam). Because a judge must "form judgments of the actors in those court-house dramas called trials" and "render decisions" based on them, rulings resting on record evidence "almost never constitute a valid basis for a bias or partiality motion." *Liteky v. United States*, 510 U.S. 540, 551, 555 (1994) (internal quotation marks and citations omitted). "[O]nly in the rarest circumstances," the Supreme Court has warned, will rulings "evidence the degree of favoritism or antagonism required" to warrant recusal. *Id.* at 555. Finding that Puma identified no bias approaching the level required for recusal, Judge Lamberth denied the foundation's motion. We review a district judge's refusal to recuse under section 455(a) for abuse of discretion. *United States v. Pollard*, 959 F.2d 1011, 1031 (D.C. Cir. 1992).

In support of its claim that an "objective observer" would "reasonably question Judge Lamberth's impartiality," Appellant's Br. at 21-22, Puma points only to the judge's rulings. The foundation alleges neither that Judge Lamberth relied on something other than the evidence before him, nor that

the rulings reflect the kind of "extreme" bias that could provide a basis for recusal. *See Liteky*, 510 U.S. at 551. Moreover, as Puma's counsel conceded at oral argument, the foundation never appealed the decisions it now claims are so biased. Tr. of Oral Arg. at 30-31. Given this, we have no basis for concluding that Judge Lamberth abused his discretion in denying the motion to recuse. Quite to the contrary, as we shall now explain, his rejection of Puma's effort to recuse under both sections 455 and 144 was fully justified.

## V.

Rule 11 of the Federal Rules of Civil Procedure provides that in submitting motions and other pleadings, or defending them before the district court, attorneys vouch that "the claims, defenses, and other legal contentions therein are warranted by existing law or a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law." Fed. R. Civ. P. 11(b)(2). Attorneys also warrant that "the allegations and other factual contentions [therein] have evidentiary support." Fed. R. Civ. P. 11(b)(3). Federal Rule of Appellate Procedure 38 provides that if the court determines that an appeal is "frivolous," it may award "just damages and single or double costs to the appellee." Under Federal Rule of Appellate Procedure 46, courts of appeals have authority to discipline attorneys who engage in "conduct unbecoming a member of the bar"; if the attorney is a member of the court's bar, the court has authority to suspend or disbar the attorney for such conduct. In filing the motion to recuse and appealing Judge Lamberth's denial of it, we believe that attorneys G. Michael Nelson, who represented the foundations in the district court and who wrote and filed the appellate briefs, and David A. Maney, who argued the case before us, may have run afoul of one or more of these rules.

To begin with, both the motion to recuse and this appeal are

frivolous in two respects. First, as we have shown, the motion was not only untimely, but blatantly so. *Supra* at 10-11. The case law, moreover, is clear enough that any reasonably diligent attorney should have known this. As we pointed out, no case we know of permitted a delay even remotely as long as the one at issue here. *See supra* at 11. Given this, we cannot imagine how attorneys Nelson and Maney could have thought that the delay in filing the motion was at all defensible.

Second, the motion rests entirely on judicial rulings, which virtually never provide a basis for recusal. *See supra* at 12-13. Indeed, we have found no case where this or any other federal court recused a judge based only on his or her rulings. At oral argument, Mr. Maney conceded that he too knew of no such case. Tr. of Oral Arg. at 30. The absence of such case law is hardly surprising, for if disqualification were required "merely as a result of counsel's disagreement with judicial conclusions reached in the course of litigation, the judicial system would grind to a halt." *Barnett v. City of Chicago*, 952 F. Supp. 1265, 1269 (N.D. Ill. 1997). Indeed, even if a particular ruling or a series of rulings revealed bias, we doubt very much that a recusal motion would be proper where, as here, the movant could have appealed the challenged decisions but failed to do so. "Almost invariably," the Supreme Court has admonished, adverse judicial decisions give "proper grounds for appeal, not recusal." *Liteky*, 510 U.S. at 555.

In addition to being frivolous, Puma's motion to recuse and its appellate briefs—filed by attorney Nelson and defended in this court by attorney Maney—contain false statements. For example, the motion states that, "without ever having met Ms. Steffen, without Ms. Steffen ever having been accused of any wrongdoing, without a shred of contradictory evidence or testimony, Judge Lamberth unilaterally announced that he would not believe any of Ms. Steffen's sworn testimony." Puma Foundation's Mem. in Supp. of Its Mot. for Recusal at 3-4. This

accusation, reiterated virtually word for word in Puma's brief to this court, Appellant's Br. at 16, relates to Judge Lamberth's treatment of an affidavit Steffen filed in support of Bilzerian's motion to purge his contempt. Denying that motion, Judge Lamberth explained: "The Court does not find . . . the affidavit of Ms. Terri L. Steffen, filed with defendant's Certificate, to be credible. . . . [T]he wording used by Ms. Steffen . . . leaves much open to interpretation as to whether there are other documents that have not been turned over." *SEC v. Bilzerian*, No. 89-1854, slip op. at 3 (D.D.C. June 28, 2001) (order denying motion to certify full compliance). Contrary to Puma's allegations, then, Judge Lamberth did not say that he would "not believe *any* of Ms. Steffen's sworn testimony" (emphasis added). He questioned only the credibility of the affidavit Steffen "filed with defendant's certificate." Nor did Judge Lamberth make this finding without "a shred of evidence." "The wording used by Ms. Steffen," the Judge explained, "leaves much open to interpretation."

Equally false are two statements about a temporary restraining order: "On November 8, 2002, without notice, without a hearing, and without providing Puma an opportunity to be heard, Judge Lamberth unilaterally extended [an existing] TRO until November 18, 2002." "On November 18, 2002, in violation of Rule 65(b), which prohibits a TRO from being extended more than once . . . Judge Lamberth entered yet a third TRO." Puma Foundation's Mem. in Supp. of Its Mot. for Recusal at 9; *see also* Appellant's Br. at  21 (repeating the allegations in virtually identical language). The facts, however, are quite different. In the November 8 order, Judge Lamberth explained that an existing TRO, entered a week earlier, would expire on November 18, noted that the receiver had moved to extend the TRO, and ordered that Puma file any response by November 15. *SEC v. Bilzerian*, No 89-1854 (D.D.C. Nov. 8, 2002) (order setting time to respond). When Puma failed to respond, Judge Lamberth extended the TRO on November 18.

*SEC v. Bilzerian*, No 89-1854 (D.D.C. Nov. 18, 2002) (order extending TRO).   So contrary to Puma's allegations, Judge Lamberth did not "extend[]" the TRO on November 8, did not act "unilaterally," did not act "without notice," did not act "without providing Puma an opportunity to be heard," and did not "enter[] yet a third TRO."

Both in its motion to recuse and initial brief to this court, Puma represented that it "has never been a party to this action." Puma Foundation's Mem. in Supp. of Its Mot. for Recusal at 2; Appellant's Br. at 13.   This assertion is false.   Through the consent agreement, incorporated by reference into the consent judgment, Puma agreed to:  "(i) enter a general appearance; (ii) consent to the Court's jurisdiction over [it] and the subject matter of this action and waive any objections as to venue; (iii) consent to entry of the Final Judgment; (iv) waive findings of fact and conclusions of law; and (v) waive any right to trial by jury; (vi) waive any right to appeal from the Final Judgment; and (vii) consistent with 17 C.F.R. 202.5(f), waive any claim of double jeopardy based on settlement of this action."   Given all this, we cannot understand how a reasonably diligent lawyer could have signed a pleading stating that the foundation "has never been a party to this action."

According to Puma, Judge Lamberth confiscated its assets "without notice."   Puma Foundation's Mem. in Supp. of Its Mot. for Recusal at 4; Appellant's Br. at 13.   Referring to an order requiring Puma to deposit its Cimetrix securities in the court's registry, *SEC v. Bilzerian*, No 89-1854 (D.D.C. June 1, 2001) (order granting preliminary possession), this claim is also false. Judge Lamberth's order followed an earlier order issued by Judge Stanley Harris, who presided over the case prior to Judge Lamberth.   Responding to a voluminous filing by the receiver, Judge Harris froze Puma's assets, ordering it and others to show cause by May 29 why the court should not grant the receiver's request for preliminary possession.   *SEC v. Bilzerian*, No 89-

1854 (D.D.C. May 11, 2001) (order granting ex parte temporary asset freeze and other relief). On June 1, three days after the May 29 deadline had passed, Judge Lamberth, having taken over the case from Judge Harris, entered the order requested by the receiver. Contrary to Puma's allegations, therefore, Judge Lamberth did not act "without notice."

While it is troubling enough that attorney Nelson included these false statements in both the Motion to Recuse and Appellant's Brief, and that attorney Maney defended these documents in this court, the statements are particularly serious because they also appear (either expressly or by reference) in Steffen's section 144 affidavit—an affidavit that, pursuant to section 144, Nelson certified as "made in good faith." Certifying a section 144 affidavit containing obvious falsehoods constitutes extremely serious misconduct, as the attorney's certificate plays a critical role in the recusal process. In order to prevent a truly biased judge from blocking an attempt to recuse, the judge, in deciding whether to grant the recusal motion, must accept the affidavit's factual allegations as true even if the judge knows them to be false. *Berger v. United States*, 255 U.S. 22, 35-36 (1921). But to guard against the removal of an unbiased judge through the filing of a false affidavit, *see United States v. Haldeman*, 559 F.2d 31, 134 (D.C. Cir. 1976) (en banc), the statute requires the attorney presenting the motion to sign a certificate stating that both the motion and declaration are made in good faith, *see Bhd. of Locomotive Firemen v. Bangor & Aroostook R.R.*, 380 F.2d 570, 578 n.17 (D.C. Cir. 1967) (noting general recognition that the certificate must attest to good faith behind both the motion and declaration). Hence, when an affidavit contains statements the attorney should know to be false, or when the attorney should know that the motion is baseless, certification undermines the integrity of the recusal process. Yet in this case, notwithstanding the motion's frivolousness and the affidavit's false statements, attorney Nelson certified both.

Given Nelson's conduct, he should consider himself fortunate that Judge Lamberth did not impose Rule 11 sanctions. Rules 38 and 46 of the Federal Rules of Appellate Procedure, however, give us independent authority to ensure compliance with ethical standards in this court. Under Rule 38, lawyers have been sanctioned for filing appeals less frivolous than this one. *E.g., Tareco Properties, Inc. v. Morriss,* 321 F.3d 545, 548-50 (6th Cir. 2003) (finding sanctions appropriate where a plaintiff's attorneys appealed denial of a motion for relief from judgment based on "oversight or omission, mistake, inadvertence, or excusable neglect" but identified no legitimate "mistake, inadvertence, surprise, or excusable neglect"); *Nagle v. Alspach*, 8 F.3d 141, 144-46 (3d Cir. 1993) (finding sanctions against an attorney appropriate where the appeal challenged only two of four conclusions used to support summary judgment, hence dooming the appeal even if the challenges were successful). Lawyers whose briefs contain false statements or who file frivolous appeals have been sanctioned under Rule 46 for behavior "unbecoming a member of the bar." *DCD Programs, Ltd. v. Leighton*, 846 F.2d 526 (9th Cir. 1988) (false statements); *In re Solerwitz*, 848 F.2d 1573 (Fed. Cir. 1988) (en banc) (frivolous appeals). Given the importance of the attorney's certificate as a check on abuse of the recusal process, the Supreme Court has suggested that disbarment may be appropriate for lawyers who certify false section 144 affidavits. *Berger*, 255 U.S. at 35.

In view of these standards and Nelson's and Maney's behavior, we will order them to show cause why they should not be sanctioned or otherwise disciplined. Specifically, they will be directed to show cause why they should not be required to reimburse the receiver for fees and expenses incurred in defending this appeal, referred to the bars of the states in which they are licensed to practice law, and/or referred to this court's Committee on Admissions and Grievances for investigation and a recommendation as to whether a disciplinary sanction is

warranted.

A final point:  This is not the only time that attorney Nelson has represented a client trying to recuse Judge Lamberth.  In the fall of 2002, Ernest B. Haire III, another party to the receivership proceedings in the district court, filed a *pro se* motion to recuse Judge Lamberth, alleging not only that he (Haire) had "filed with the United States Department of Justice a verified criminal complaint against Judge Royce C. Lamberth for several violations of federal law," but also that he had filed "formal complaints with the Senate Subcommittee on Administrative Oversight and the Courts and the Senate Judiciary Committee requesting that Judge Lamberth be removed from his position as a federal judge because he is dishonest, has no respect for the law or the Constitution, and is unfit to serve in any judicial capacity."  Mem. in Supp. of Ernest B. Haire's Mot. For Recusal at 1, 3, *SEC v. Bilzerian,* No. 02-1221 (D.D.C. Nov. 15, 2002).  Denying the motion, Judge Lamberth ruled that Haire could not "manufacture" grounds for recusal by filing complaints.  *SEC v. Bilzerian*, No. 02-1221 (D.D.C. Dec. 4, 2002).  Attorney Nelson, having been retained by Haire, petitioned this court for a writ of mandamus directing Judge Lamberth to recuse himself.  We rejected the petition, concluding that Judge Lamberth had not abused his discretion in denying the motion.  *In re Haire*, 2003 WL 1873948, (D.C. Cir. Apr. 2, 2003) (per curiam).  Undaunted, attorney Nelson filed a notice of appeal, again seeking Judge Lamberth's recusal. Again we rejected his efforts, reminding Nelson that our previous decision "is the law of the case."  *Bilzerian*, 378 F.3d at 1102 n.1.  In other words, before this appeal, Nelson brought a "manufactured" motion to recuse Judge Lamberth before this court not once, but twice.

## VI.

Sections 144 and 455(a) play a critical role in protecting the

integrity of the judicial system. As Judge Jerome Frank observed: "Democracy must, indeed, fail unless our courts try cases fairly, and there can be no fair trial before a judge lacking in impartiality and disinterestedness." *In re J. P. Linahan, Inc.*, 138 F.2d 650, 651 (2d Cir. 1943). Abuse of these statutes, however, is another matter.

The district court's orders are affirmed in all respects. Attorneys G. Michael Nelson and David A. Maney are ordered to show cause within 30 days why they should not be sanctioned for the conduct described in this opinion. Attorneys Nelson and Maney are ordered to show cause why they should not be held liable for single or double costs and attorneys' fees incurred by the receiver in defending Puma Foundation's appeal from denial of the motion to recuse. They are further ordered to show cause why they should not be referred 1) to the bars of the states in which they are licensed to practice law and/or 2) to this court's Committee on Admissions and Grievances for investigation and a recommendation as to whether a disciplinary sanction is warranted.

*So ordered.*